THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL COOK, Defendant-Appellant.

First District (6th Division)  No. 1—86—1358

Opinion filed July 6, 1990.

450

William H. Hall, Jr., of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Kenneth

T. McCurry, and David S. Meyerson, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE LaPORTA delivered the opinion of the court:

Following a jury trial, defendant, Michael Cook, was convicted of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(1)) and attempted armed robbery (Ill. Rev. Stat. 1983, ch. 38, pars. 8—4, 18—2) and was sentenced to concurrent prison terms of 25 and 10 years, respectively. On appeal, defendant contends that (1) the trial court erred in denying his pretrial motion to suppress evidence, (2) his sentences were based upon improper factors, (3) his sentences were excessive, and (4) he was deprived of a fair trial because comments made by the prosecutor during closing argument were improper.

Defendant was charged with three counts of murder, one count of armed violence, and one count of attempted armed robbery in connection with the shooting death of 55-year-old Bernice Tyler. Fourteen-year-old Patrick Williams was also implicated in the incident. Williams pleaded guilty to murder and attempted armed robbery, was adjudicated delinquent in juvenile court, and served a term of 2½ years in a youth center for the Illinois Department of Corrections, Juvenile Division.

The evidence presented by the State indicated that at approximately 7 p.m. on Friday, February 11, 1983, 17-year-old defendant and 14-year-old Williams were at Rossi's game room at Polk and Pulaski streets in Chicago, Illinois. The two young men were friends from the neighborhood, and defendant asked Williams whether he knew where they could get a gun to make some money. Williams agreed to meet defendant on the following Sunday at the Busy Bee store located near Arthington and Pulaski streets in Chicago, Illinois.

At about 9 a.m. on Sunday, February 13, 1983, Williams, without permission, went into his uncle's bedroom closet and took a black .25 caliber automatic handgun out of a coat pocket. Later that morning, Williams went to meet defendant at the Busy Bee store. Samuel Norris, John Rankins, and defendant were already there when Williams arrived. While in the store, Williams pulled defendant aside and showed him the gun, which was in a pocket of the quilted ski vest that Williams was wearing. Williams subsequently pointed the gun at Norris and told him that it was a stick up, but then indicated that he was only playing.

At about that time, the victim, Bernice Tyler, was walking south on Pulaski past the Busy Bee store. Defendant told Williams that he

had been watching the victim and that she had a lot of money. Defendant then told Williams to hold the gun because he was a juvenile, and if the police picked him up, he would just go to the Audy home. Defendant was to act as a lookout for the police. Williams left the store with defendant, and together they followed Tyler for about a minute. Tyler was carrying two bags of groceries and a purse. Williams continued to walk behind Tyler, and defendant crossed the street. When Tyler neared a viaduct, Williams walked in front of her, pointed the gun at her, and demanded her purse. Tyler stated that she had no money, but Williams again demanded her purse. Tyler repeated that she had no money and pulled out a pocket knife which she swung at Williams. Williams jumped back, and Tyler grabbed the gun from his hand, but Williams grabbed it back and shot Tyler. She fell to the ground, and Williams and defendant began running together west and then north. Defendant told Williams that he was going home, and Williams ran into an alley where he threw the gun between two garages and hid his ski vest under some boards. Williams hid under a porch for approximately 40 minutes. He then began walking toward his uncle's house. While he was walking, his sister and brother-in-law saw him and told him that the police were looking for him. Williams got into their car, and they dropped him off at his house.

Thurmon McBride was at a junkyard at 921 South Pulaski at the time of the shooting. He heard what sounded like a car backfiring and then saw two people running west and then north. When McBride saw Tyler lying on the ground by the viaduct, he telephoned the police. Chicago police officer Robert Duewerth received a radio message at approximately 1 p.m. that a woman had been shot in the area of Arthington and Pulaski and that the suspects had been seen crossing Pulaski and running west down Taylor Street. When he arrived at the scene, Duewerth found Tyler lying on the ground on the east side of Pulaski and observed a bag of groceries, a purse, and a pocket knife on the ground near her. McBride told Duewerth that he had seen two young men running north and west from the scene and described them as two black males, aged 15 to 18 years old. One of them was about 5 feet 10 inches tall, had a medium build, dark complexion, black hair, and was wearing a black leather coat and dark trousers. The other was about 5 feet 6 inches tall and of medium build and was wearing a light and dark blue quilted vest, a gray sweater underneath, and dark pants. Duewerth broadcast these descriptions along with the information that the two individuals were wanted for robbery and for a shooting. A .25 caliber spent shell casing was recovered from the area near Tyler's body.

When police officer James Nowlin received the radio message that a woman had been shot in the area of Arthington and Pulaski and that two suspects were seen running west on Taylor Street, he proceeded to the alley on Polk Street and got out of his car. As he looked east on Polk, Nowlin saw the defendant come from behind two women and hug them. The defendant was dressed in a black leather jacket, dark blue sweater or shirt, and dark trousers, and Nowlin apprehended him because he fit the radio description of one of the offenders. Nowlin put defendant in the back seat of the squad car and took him to the scene of the shooting. McBride then identified defendant as one of the two men he had seen running after he heard the sound of the shot.

Police detective Thomas Lahm advised defendant of his *Miranda* rights, and defendant indicated that he understood those rights. Lahm did not perceive that defendant did not understand English or was of less than average intelligence. Lahm interviewed the defendant at the police station, and defendant initially denied involvement in the shooting but implicated Patrick Williams. Defendant directed Lahm to Williams' house, but Williams was not home. They then drove around and looked for Williams in areas frequented by him. Lahm subsequently returned to Williams' house, found him there, and arrested him in connection with the shooting of Tyler. Williams took Lahm to the alley in which he had thrown the gun and hidden his vest. After searching the area, the police recovered the vest, but not the gun. Upon returning to the police station, Lahm again advised defendant of his *Miranda* rights, and defendant indicated that Williams had a gun while he was in the store and had been talking about robbing people. Defendant stated that Williams asked him whether he would help him and that he and Williams left the store and started to walk south on Pulaski. Defendant crossed the street to the west side of Pulaski, and Williams confronted Tyler. Defendant said that after he heard a shot, he turned, saw Tyler fall, and then fled the area.

Thereafter, Assistant State's Attorney Thomas Fecarotta again advised defendant of his *Miranda* rights and asked defendant whether he understood them. After defendant stated that he understood each of his rights, Fecarotta questioned him about his involvement in the shooting death of Tyler. Defendant did not appear to have any trouble understanding English, Fecarotta had no trouble understanding the defendant, and defendant never requested the services of an interpreter. At that time, defendant stated that he had agreed to participate with Williams in the robbery, and when they saw Tyler, he said that they could rob her and asked Williams whether he wanted to

do it. Defendant stated further that he and Williams left the store together and walked behind Tyler. Thereafter, defendant crossed the street because he recognized Tyler and was afraid that she would recognize him. Defendant saw Williams confront Tyler and saw her swing a knife at him. He then saw Williams jump back and fire one shot at Tyler, and he saw Tyler fall to the ground. Defendant stated that he then walked across the street to the store, and Williams ran from the scene in the opposite direction.

After making his verbal statement, defendant agreed to have it recorded by a court reporter. Defendant was advised of his *Miranda* rights in the presence of the court reporter, and the statement was ultimately transcribed. Fecarotta then asked defendant to read the statement aloud. Defendant did so with no apparent difficulty. He then made a few minor changes, initialled each page, and signed the statement which was witnessed by Fecarotta and Lahm.

At trial, defendant denied any knowledge of or involvement in the shooting, stating that he left the store five minutes after Williams had and went home. Defendant also testified that he did not understand his *Miranda* warnings and so advised the police officers and the State's Attorney. He stated further that he could not read very well, and although he initialed each page, he did not understand the written statement that he signed. Defendant also denied that he ever said he understood his *Miranda* warnings in the presence of a court reporter. Defendant's mother testified that she tried unsuccessfully to visit her son while he was in custody on the day of the incident.

The stipulated testimony of Rella Jordan, a certified court reporter, indicated that defendant had previously testified at a bond reduction hearing that he was able to see his mother while he was in police custody on February 13, 1983.

During rebuttal closing argument, the prosecutor made the following remarks:

> "They are the ones that have gotten together and conspired and made up a conspiracy to convict, poor Michael—innocent, poor little Mr. Cook, because they all lied and Mr. Cook told the truth.
>
> * * *
>
> Then, they with their lawyer standing here, and sling mud at everybody.
>
> * * *
>
> They stand there and they throw mud at witnesses, everyone else is lying.
>
> * * *

Patrick Williams that little vicious murderer, testified because he asked him to, because he is the one who got together with him, back three years ago and decided to do an armed robbery. The criminal pig, his witnesses, ladies and gentlemen, we don't."

The jury found defendant guilty of murder and of attempted armed robbery. Defendant filed a motion for a new trial which challenged only the propriety of the court's response to a question from the jury during their deliberations.

In imposing sentence, the trial judge noted that defendant's conduct caused Tyler's death. The court also referred to Tyler's age and to the fact that she had left a family. Defendant was sentenced to a 25-year term for murder and to a 10-year term for attempted armed robbery.

■ Defendant initially claims that the trial court erred in denying his motion to suppress evidence. Yet, defendant's opening brief presents no facts, argument, or citations to relevant authorities in support of his position, asserting only that he has not yet received the transcript of the hearing on the motion to suppress. In addition, defendant has not filed a reply brief or sought leave to file a supplemental brief presenting argument or authority on this issue. Because defendant has not complied with Supreme Court Rule 341(e)(7) (107 Ill. 2d R. 341(e)(7)), we need not consider this issue. *Thanopoulos v. Pickens* (1980), 87 Ill. App. 3d 906, 409 N.E.2d 477.

We note, however, that even if defendant had properly presented this issue, examination of the motion to suppress and the record reveals that the trial court's denial of the motion was proper.

In his motion to suppress, defendant first makes conclusory allegations that his statements to the police were obtained in violation of his privilege against self-incrimination and his right to counsel. He does not, however, present any facts or authority in support of these claims. Defendant asserts further that although he was in custody and had been charged, he did not understand the gravity of his custodial situation. Yet, the motion does not claim that defendant did not receive or understand his *Miranda* warnings.

Defendant's motion to suppress alleges further that he is "slow and cannot read and does not understand and cannot understand basic articulable concepts in the English language unless spoken in 'black English' or spoken by persons with verbal facility in black English." Again, the motion does not assert that defendant did not receive or understand his *Miranda* warnings and does not indicate that he requested or was refused the services of an interpreter (see Ill.

Rev. Stat. 1983, ch. 38, par. 165—11). Subnormal mentality does not automatically make a statement involuntary as long as the accused is capable of understanding the meaning and effect of the statement. *People v. Hester* (1968), 39 Ill. 2d 489, 500, 237 N.E.2d 466, 474.

Examination of the transcript of defendant's testimony at trial and at the earlier bond reduction hearing reflects that he was able to understand the questions put to him although they were not spoken in "black English" and that he was able to communicate effectively and to give clear and intelligible answers to the questions posed. Consequently, it does not appear that defendant's statements to the police should have been suppressed based upon his mentality or alleged inability to understand the English language.

■ The credibility of the witnesses regarding the voluntariness of a statement is to be determined by the trial court, and that determination will not be overturned unless it is contrary to the manifest weight of the evidence. (*People v. Weger* (1962), 25 Ill. 2d 370, 374, 185 N.E.2d 183, 186; *In re Bizzle* (1976), 36 Ill. App. 3d 321, 325, 343 N.E.2d 633, 637.) After the hearing on defendant's motion to suppress in the instant case, the trial court concluded that there was no reason to believe that defendant's statements to the police were involuntary and, accordingly, denied the motion.

■ This conclusion is more than amply supported by the evidence in the record. Defendant's testimony at trial that he did not understand his *Miranda* warnings and that he so advised the police officers and State's Attorney was directly controverted by the testimony of Lahm and Fecarotta, who testified that defendant was advised of his *Miranda* rights on at least three different occasions during his interrogation and prior to signing the written statement. According to Lahm and Fecarotta, defendant stated that he understood each of his rights as they were read to him, and thereafter defendant voluntarily made verbal statements which were recorded by a court reporter who later transcribed her notes into a written statement. After reading the statement aloud, defendant made a few minor changes and then voluntarily signed the written statement and initialed each page. This testimony was corroborated by the stipulated testimony of Blanca Lara, the court reporter who recorded and transcribed defendant's statements. Therefore, the trial court's finding that defendant's statements were voluntary and admissible was not against the manifest weight of the evidence.

■ Defendant's motion also asserts that his mother was not permitted to be present during his custodial interrogation. Yet, this circumstance clearly does not amount to a violation of defendant's con-

stitutional rights because he was 17 years old at the time of the offense and was eligible to be tried as an adult (*People v. Del Vecchio* (1989), 129 Ill. 2d 265, 544 N.E.2d 312). Consequently, defendant was not entitled to have his mother present during the interrogation. Even where the accused is a juvenile, the failure to have a parent or guardian present during questioning does not necessarily render statements made at that time inadmissible. (*People v. Steptore* (1972), 51 Ill. 2d 208, 215, 281 N.E.2d 642, 645; *People v. Zepeda* (1970), 47 Ill. 2d 23, 28, 265 N.E.2d 647, 649; *In re Bizzle*, 36 Ill. App. 3d at 326, 343 N.E.2d at 638.) In addition, this claim was refuted by the introduction at trial of defendant's prior testimony at a bond reduction hearing at which he stated that his mother was with him in the back seat of the squad car and was with him at the police station. See *Hester*, 39 Ill. 2d at 499, 237 N.E.2d at 473.

■ Finally, defendant's motion to suppress asserts that he was deprived of effective assistance of counsel where his former attorney at the bond reduction hearing allowed him to testify and to be subjected to extensive cross-examination with respect to his possible defenses. The record reflects, however, that none of this evidence was admitted against defendant at trial. Consequently, this claim does not provide a basis to grant defendant a new trial.

Defendant next contends that his sentences were based upon improper factors because it was improper for the sentencing court to consider the death of the victim as an aggravating factor where the death was implicit in the offense. *People v. Martin* (1988), 119 Ill. 2d 453, 459-60, 519 N.E.2d 884, 887; *People v. Saldivar* (1986), 113 Ill. 2d 256, 267-68, 497 N.E.2d 1138, 1144; *People v. Conover* (1981), 84 Ill. 2d 400, 404, 419 N.E.2d 906, 908-09.

At the sentencing hearing, the trial judge stated, *inter alia*:

"The [c]ourt has to take into consideration the other matters in aggravation and mitigation, which are set forth by the [s]tatute, there is no question in the [c]ourt's mind that your conduct, although you were not the shooter, certainly caused serious physical harm, and in fact, death to an elderly person. ***
***

I recall in this case there was an innocent and elderly lady, a mother, a grandmother, *** and it is certainly unfair to her and to her family that she is dead, *** the evidence certainly points to the fact that you were as much involved, if not more so involved, than the juvenile."

■ Contrary to defendant's claim, we are not persuaded that these comments indicate that the trial judge considered improper fac-

tors in aggravation. Rather, we hold that the trial judge's comments, when taken in their entirety, reflect the court's finding that defendant was responsible for the shooting of Tyler and was as culpable as the juvenile co-offender whom he had solicited for the crime.

■■ Murder is punishable by a term of not less than 20 and not more than 40 years' imprisonment (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), 1005—8—1(1)), and attempted armed robbery is punishable by a term of not less than four and not more than 15 years' imprisonment (Ill. Rev. Stat. 1983, ch. 38, pars. 8—4(c)(2), 1005—8—1(4)). Defendant was sentenced to a term of 25 years for murder and a term of 10 years for attempted armed robbery. Thus, defendant's sentences were well within the statutory limits.

Moreover, we find that defendant was not entitled to the minimum sentences where he had solicited a juvenile's participation in the crime and had convinced the juvenile to carry the weapon in case they were apprehended by the police. Upon review of the entire record before us, we conclude that defendant's sentences were not excessive and that the court relied on proper factors in imposing the sentences.

Defendant also asserts that his sentences were excessive and grossly disparate to the penalty imposed upon his juvenile co-offender. This argument is without merit.

■■ Defendant, who was 17 years old at the time of the offense, received sentences of 25 years for murder and 10 years for attempted armed robbery. Fourteen-year-old Williams pleaded guilty to the charges against him and was adjudicated delinquent in juvenile court. Williams ultimately served 2½ years in a youth center for the Department of Corrections, Juvenile Division. Yet, it is inappropriate to compare the penalty imposed upon Williams to that received by defendant because the juvenile division under which Williams was adjudicated is separate and distinct from the adult system in which defendant was tried, convicted, and sentenced.

When determining whether commitment to the Department of Corrections is necessary, a juvenile court must consider many factors, including the best interests of the minor. (Ill. Rev. Stat. 1983, ch. 37, pars. 705—1, 705—2, 705—10.) Consequently, a juvenile court is never required to commit a minor to the Department of Corrections, and a minor may serve no time in juvenile detention, regardless of the offense committed.

A criminal court does not operate under similar constraints or guidelines when sentencing an adult offender. Rather, the court is required to impose a sentence within the range of appropriate penalties set forth by the legislature.

Consequently, there will almost certainly be a disparity between the penalty imposed upon a juvenile offender and that imposed upon an adult offender, even where they have committed the same offense. Despite the existence of such disparity, a criminal court is required to sentence an adult offender within the range of penalties set out by the legislature, and such sentence should not be set aside merely because a juvenile offender received a more lenient penalty. It must be noted that none of the authorities relied upon by defendant involved a juvenile offender or required that an adult offender's sentence be vacated because it was excessive and disparate to the penalty imposed upon a juvenile offender.

■ Defendant asserts further that the severity of his sentences was not justified because he participated in the offense to a lesser extent than Williams. We find this argument to be unpersuasive. The trial court's comments during sentencing clearly reflect that the court did not believe that defendant was less culpable than Williams. The court noted that defendant had solicited Williams to obtain the weapon, engaged Williams to commit the robbery, and directed him to carry the gun specifically because he was a juvenile and would receive a more lenient penalty if apprehended. Contrary to defendant's claim, the trial court found that defendant's participation in the offense was equal to or greater than that of Williams (cf. People v. Bennett (1980), 90 Ill. App. 3d 64, 412 N.E.2d 1001; People v. Hall (1973), 17 Ill. App. 3d 1, 307 N.E.2d 664), and defendant's sentences will not be vacated on this basis.

Finally, defendant alleges that he was deprived of a fair trial because remarks made by the prosecutor during closing argument were improper.

■ ■ Initially, it must be noted that defendant did not raise this issue in his motion for a new trial and objected to only some of the allegedly improper comments at trial. Absent plain error, failure to raise an issue at trial and in a post-trial motion constitutes waiver of the issue on appeal. (People v. Turner (1989), 128 Ill. 2d 540, 555, 539 N.E.2d 1196, 1202; People v. Enoch (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1131-32, cert. denied (1988), 188 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 247.) The plain error exception will be applied only when the evidence is closely balanced or if the error is of such a magnitude that the accused is denied a fair and impartial trial. (Turner, 128 Ill. 2d at 555, 539 N.E.2d at 1202.) Plain error will not be found where, as here, the evidence against the defendant is overwhelming and the allegedly improper remarks did not deprive him of a fair trial. Consequently, defendant has waived this issue by failing to

object at trial and by failing to include it in his motion for a new trial. *Turner*, 128 Ill. 2d 540, 539 N.E.2d 1196; *Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124.

■■■ Even if defendant had properly preserved this issue for appeal, it does not appear that the remarks of the prosecutor warrant a new trial.

As the State points out in its brief, the remark "criminal pig" makes no sense in the context of the prosecutor's other statements, and more likely appears to be a typographical error which should have read "the criminal 'picks' his witnesses, ladies and gentlemen, we don't." In addition, the prosecutor's comments regarding defendant's "mudslinging" were in response to defense counsel's disparagement of the State's witnesses. Specifically, defense counsel accused Williams and McBride of fabricating testimony. Thus, the prosecutor's comments were intended to rebut these accusations by defense counsel.

■■■ ■ Even where remarks are improper, they will not be considered reversible error unless they constitute a material factor in the defendant's conviction or result in substantial prejudice to the accused. (*People v. Terry* (1984), 99 Ill. 2d 508, 517, 460 N.E.2d 746, 750; *People v. Satchell* (1981), 94 Ill. App. 3d 422, 428-29, 418 N.E.2d 1063, 1068; *People v. Nodal* (1980), 89 Ill. App. 3d 538, 541, 411 N.E.2d 1087, 1089-90.) Improper remarks may be considered harmless error if there is overwhelming evidence of defendant's guilt. (*People v. Franklin* (1981), 93 Ill. App. 3d 986, 994, 418 N.E.2d 155, 160-61.) The evidence against defendant in the instant case was overwhelming, and it cannot be said that the prosecutor's remarks resulted in substantial prejudice or constituted a material factor in his conviction. Accordingly, the prosecutor's comments did not prejudice defendant or operate to deprive him of a fair trial.

For the foregoing reasons, the judgments of the circuit court of Cook County are affirmed.

*Affirmed.*

McNAMARA and RAKOWSKI, JJ., concur.