613 N.E.2d 1139 (1992)
244 Ill. App.3d 55
184 Ill.Dec. 547
In re D.C., a minor (The People of the State of Illinois, Plaintiff-Appellee,
v.
D.C., a minor, Defendant-Appellant).
No. 1-90-0981.
Appellate Court of Illinois, First District, Fifth Division.
July 17, 1992.
*1140 Rita A. Fry, Public Defender of Cook County, Chicago (Greg Koster, Asst. Public Defender, of counsel), for defendant-appellant.
Jack O'Malley, State's Atty., County of Cook, Chicago (Renee Goldfarb, Veronica X. Calderon, Michelle R. Martone, Asst. State's Attys., of counsel), for plaintiff-appellee.
Justice MURRAY delivered the opinion of the court:
On January 26, 1990, D.C., a minor, was found delinquent on a charge of first degree murder. On March 12, 1990, he was made a ward of the court and committed to the Department of Corrections.
*1141 On appeal D.C. argues that the trial court erred in its denial of his motion to suppress statements. D.C. also argues that he was denied a fair trial where his attorney called him to the stand to admit his guilt, argued erroneous legal theories and left the court no choice but to convict him of first degree murder.
For the following reasons we affirm the decision of the trial court.
D.C. was charged with first degree murder for his alleged participation in the fatal beating of Amiri Tutwiler on December 20, 1987. D.C.'s pretrial motions to quash arrest and to suppress statements were heard alongside those of D.M. and J.D. D.C.'s case was heard in a simultaneous, severed proceeding with those of D.M. and J.D., whose cases are not currently before this court.

MOTION TO QUASH ARREST
On December 20, 1987, at 9 p.m. Amiri Tutwiler flashed the wrong gang signals; nine teenage males climbed out of a passing van and chased down and fatally beat him. On January 13, 1988, the police arrested and questioned three teenage males. G.S., A.S., and J.C., each implicated the respondent, an individual whom they referred to as "Booby".
At 4 p.m. on January 13,1988, Detectives Stephen Brownfield, Lawrence Nitsche and John Yucaitis proceeded to D.C.'s home. They spoke with Mrs. C. She stated that she did have a son, D.C., who went by the nickname "Booby". Mrs. C. showed the detectives a picture of her son, D.C., and told the detectives where he might be found. Mrs. C. gave the police her card and asked them to call her with information regarding her son.
At 4:45 p.m. the three police officers stopped D.C. as he was crossing the street. He told the police officers his name was D.C. and that he was also known as "Booby." The three officers handcuffed D.C. and placed him under arrest in the back seat of their car. The respondent's pretrial motion to quash his arrest was denied by the trial court. No issue regarding the motion to quash arrest is raised on appeal.

MOTION TO SUPPRESS STATEMENTS
D.C. moved to suppress statements allegedly made by him on January 13, 1989, the day of his arrest. Those statements include those made to arresting detectives on the street at 4:45 p.m., at area two at 5:30 p.m., and those made to Assistant State's Attorney Mary Shields (an oral statement made at 10:45 p.m. and a court reported statement at 10:54 p.m.)
Detectives Stephen Brownfield, Lawrence Nitsche and John Yucaitis arrested D.C. as he was crossing 79th Street near Drexel and placed him in the back of their car on January 13, 1988, at 4:45 p.m. Detective Brownfield alleged and D.C. denied both that Detective Brownfield gave D.C Miranda warnings and that D.C. gave Detective Brownfield a short synopsis of the events leading to the death of Amiri Tutwiler, implicating in the process co-respondent, D.M.
The detectives arrested D.M. on the street a short time later. Detective Brownfield testified he "believed" he returned to the apartment of D.C.'s mother, Mrs. C., and told her that he arrested her son and was taking him to area two. Alternatively, D.C., D.M., and Mrs. C. each testified, that Detective Brownfield neither returned to Mrs. C.'s apartment nor notified her that he had arrested D.C.
Detectives Brownfield, Yucaitis and Nitsche transported D.C. and D.M. to area two. They arrived shortly before 5:30 p.m. and Detective Yucaitis took the respondent to an interview room. Detective Yucaitis alleged and D.C. denied the reading of Miranda warnings. D.C. alleged and Detective Yucaitis denied a promise of leniency in return for the incriminating statement respondent made to Yucaitis. Detective Brownfield "believed" D.C. was offered something to eat by himself or the other detectives. D.C. testified that the police officers did not offer him food, water, or use of washroom facilities.
The trial court suppressed D.C.'s statements to the arresting detectives in their car and at area two at 5:30 p.m. for two *1142 reasons. First, there was conflicting testimony with respect to the giving of Miranda warnings (no written waiver of rights form had been tendered to D.C.) and, second, because no adult who was interested in D.C.'s well-being was present during the statements.
Mrs. C. testified that the police had not informed her that her son had been arrested and was being taken to area two. At 8 p.m. Mrs. C.'s daughter told Mrs. C. that she had heard hews of D.C.'s arrest. Mrs. C. phoned police to find out where D.C. had been taken. She then drove to area two, arriving there between 9 and 9:30 p.m. Detective Brownfield testified that he did not know when Mrs. C. arrived at area two.
Upon her arrival at area two, Mrs. C. was directed upstairs to a lounge where she saw D.M.'s mother and J.D.'s mother. Mrs. C. testified that after waiting in the lounge for 30 minutes she spoke with Detective Brownfield and asked to see her son. According to Mrs. C., Detective Brownfield told her that D.C. was being held for murder and that it would be awhile before she could see him. Detective Brownfield did not refer to any conversation with Mrs. C. in his testimony. He stated, "[T]here was a bunch of mothers was [sic] there. We had at that time, we had quite a few youths in custody." He testified that he never "denied" Mrs. C. the chance to see her son. Youth Officer William Radigan also testified he knew there were parents present at area two but did not know which ones, or how many there were. He did not approach the desk sergeant and ask which parents were present.
Youth Officer Radigan testified he was not present when police questioned D.C. Youth Officer Radigan was present but silent during D.C.'s oral and court reported statements to Assistant State's Attorney Mary Shields (ASA Shields). ASA Shields did not introduce the youth officer to D.C. The youth officer did not say anything to D.C.
At 10:50 p.m., D.C. was joined in a room at area two police headquarters by arresting Officer Stephen Brownfield, Youth Officer William Radigan and ASA Shields. D.C. would refer to them "as a room full of white people." ASA Shields offered D.C. food, water, and the opportunity to use the washroom. Before taking an oral statement from D.C., she also gave him Miranda warnings, which D.C. stated he understood. ASA Shields did not give D.C. a written Miranda waiver form to sign. D.C. testified that he had been unfamiliar with Miranda warnings and could not recall having received them on September 21, 1987, or October 11, 1987. However, Officers James Martin and Glen Evans testified that they were present when D.C. had been given Miranda warnings on those dates.
None of the individuals involved in taking the defendant's statement told D.C. his mother was at the station trying to see him. Detective Brownfield testified that D.C. did not ask, in his presence, to use a phone or to have an adult or an attorney present. He also testified he "never denied" Mrs. C. a chance to see her son.
D.C. testified he was crying during the oral statement. ASA Shields testified that D.C. was not crying during the statements. ASA Shields also testified that D.C. made no complaint of mistreatment to her. ASA Shields questioned D.C. for a few minutes, at 10:50 p.m. then left. Youth Officer Radigan and Detective Brownfield left as well. At 10:54 p.m. ASA Shields returned with Youth Officer Radigan, Detective Brownfield and a court reporter. ASA Shields noted each person's name and office for the record at the beginning of the court reported statement. At 11:35 p.m. D.C. read the statement and initialed each page.
D.C. testified on his own behalf at the suppression hearing. The following is an excerpt from D.C.'s testimony:
"Q. Now before the State's Attorney came into the room and read you your Miranda Rights and also interviewed you, did you see your mother?
A. No.
Q. Did anybody tell you that your mother was there?
A. No.
Q. Did anybodydid the State's Attorney offer you food?

*1143 A. Yes.
Q. Did she offer you water?
A. Yes.
Q. Did she allow you to go the bathroom?
A. Yes.
Q. When she came in the room, did she tell you that you had a right to have your mother present during the questioning?
A. Yes."
The trial court denied D.C.'s motion to suppress his two statements to ASA Shields, finding that the totality of the circumstances indicated that the statements to the assistant State's Attorney had been freely and voluntarily made. In its memorandum opinion the trial court stated that it "considered the circumstances surrounding the making of the statements, the fact that there were no threats or promises, the relatively short time the actual interrogation took, [D.C.'s] age (14), his prior experience with the police and his physical condition." The trial court further found that "[t]he evidence adduced at the hearing further establishes that [D.C] was not even aware that his mother was at the police station and that he never asked to see her." The court noted that while the youth officer did not actively participate in the interrogation of D.C., "it is clear that he was there and that [D.C.] had the `opportunity' to ask him for any advice or counsel if he had chosen to do so." The court found no physical or psychological coercion.
During the hearing on defendant's motion, D.C.'s counsel argued that Mrs. C. indicated an interest in seeing her son prior to any interrogation and the police officers put them off. The trial court responded, "I agree that the police conduct left a lot to be desired in that regard." Later in the argument the court commented, "I agree that the people (the parents of the boys) were there and the people (the police) danced around as far as them seeing the boys." In his written findings of fact, however, the court found that while the parents were indeed at area two trying to see their sons:
"Evidence presented at the hearing on the pre-trial motions in this case, established that the scene at Area 2 on the evening of 1/13/88 was extremely hectic. Nine individuals were questioned and ultimately charged concerning the homicide of Tutwiler. Court reported statements were taken from nine people that evening. The mothers and possibly other relatives of these nine boys were at the station. This Court does not find that the exclusion of parents was purposeful by the police in an effort to isolate the minors from parents or relatives so as to coerce a statement."
Defendant argues that the denial of his motion to suppress his statement was manifestly erroneous for three reasons. First, the police behavior in isolating the 14year-old respondent from his mother was purposeful. Second, this police behavior alone, or in conjunction with the length of respondent's incarceration and other factors rendered his confession involuntary. Third, the mere physical presence of a silent, unintroduced gentleman bearing the title of "youth officer" did not accord the respondent a meaningful opportunity to speak with "an interested adult."
"With respect to voluntariness, confessions made by juveniles are generally subjected to the same scrutiny as confession of adult defendant." (People v. Knox (1989), 186 Ill.App.3d 808, 134 Ill.Dec. 564, 542 N.E.2d 910, citing People v. Prude (1977), 66 Ill.2d 470, 6 Ill.Dec. 689, 363 N.E.2d 371.) The test of whether a confession was admissible at trial is whether the state has met its burden showing that it was made freely, voluntarily and without compulsion or inducement of any sort, or whether defendant's will was overcome when he made the statement. (People v. Prim (1972), 53 Ill.2d 62, 289 N.E.2d 601.) In determining whether a statement was voluntary, the court must consider the totality of the relevant circumstances surrounding the making of the statement, including the existence of any threats, promises, or physical coercions; the length and intensity of the interrogation; and the age, intelligence, experience and physical condition of the defendant. (People v. Martin (1984), 102 Ill.2d 412, 80 Ill.Dec. 776, 466 *1144 N.E.2d 228.) A reviewing court will not disturb a finding by the trial court on the voluntariness of a confession unless the finding is contrary to the manifest weight of the evidence. People v. Davis (1983), 97 Ill.2d 1, 72 Ill.Dec. 272, 452 N.E.2d 525.
Section 4-5(2) of the Juvenile Court Act of 1987 provides:
"(2) A law enforcement officer who takes a minor into custody without a warrant under Section 4-4 shall, if the minor is not released, immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care or the person with whom the minor resides that the minor has been taken into custody and where the minor is being held; and the law enforcement officer shall without unnecessary delay take the minor to the nearest juvenile police officer designated for such purposes in the county of venue." (Ill.Rev.Stat.1987, ch. 37, par. 804-5(2).)
However, even where the accused is a juvenile, the failure to have a parent present does not necessarily render statements made at that time inadmissible. (People v. Cook (1990), 201 Ill.App.3d 449, 458, 146 Ill.Dec. 934, 558 N.E.2d 1268; People v. Steptore (1972), 51 Ill.2d 208, 215, 281 N.E.2d 642, 645.) Although, a juvenile does not have a per se right in Illinois to consult with a parent before questioning or to have the parent present during questioning, when evaluating the voluntariness of a confession or statement based on the totality of the circumstances test, the presence or absence of the parent is a factor to be considered. (People v. Brown (1989), 182 Ill.App.3d 1046, 1053, 131 Ill.Dec. 534, 538, 538 N.E.2d 909, 913.) "The key is whether the absence of an adult interested in defendant's welfare as envisioned by the statute contributed to the coercive circumstances surrounding the interview." (People v. Stachelek (1986), 145 Ill.App.3d 391, 402, 99 Ill.Dec. 249, 257, 495 N.E.2d 984, 992.) The record does not reflect that any of D.C.'s statements indicated that his confession was induced or his will overcome. Although the evidence with respect to the statements is somewhat contradictory, the issue was one of credibility and nothing in the record suggests that the trial judge's determination on that issue is contrary to the manifest weight of the evidence.
Noting that a juvenile does not have a per se right in Illinois to consult with a parent before questioning or to have the parent present during questioning, the court in People v. Brown (1989), 182 Ill. App.3d 1046, 131 Ill.Dec. 534, 538 N.E.2d 909 stated:
"However, where they indicate an interest by their presence, parents should be allowed to confer with their child before, and to be present during any questioning. The presence or absence of the parent is a factor in evaluating the voluntariness of a statement under the totality of the circumstances test. [Citation.]
* * *. The officers who know of the parent's presence have an affirmative duty to inform those actually questioning a juvenile of the parent's presence and request to see her child. And, in order to ensure the true voluntariness of a statement, those actually questioning the juvenile have an affirmative duty to stop the questioning and allow the parent to confer with her child." (Brown, 182 Ill. App.3d at 1053-54, 131 Ill.Dec. 534, 538 N.E.2d 909.)
The court in Brown held that the defendant's inability to confer with his mother, combined with the failure of the police to advise the defendant of his Miranda rights, supported the trial judge's finding that the statement was coerced.
Defendant also relies on People v. Knox (1989), 186 Ill.App.3d 808, 134 Ill.Dec. 564, 542 N.E.2d 910. In Knox, the court stated, "We are most concerned that defendant's statement was made before defendant had an opportunity to confer, prior to questioning with an adult interested in his welfare, either his parents or a juvenile officer." (Knox, 186 Ill.App.3d at 813, 134 Ill.Dec. 564, 542 N.E.2d 910.) Although the police officers testified to the contrary, defendant denied that he had been read his Miranda rights and indicated that he did not know what those rights were. Defendant testified that as a police officer was leaving the *1145 room after he questioned the defendant, defendant asked him whether his mother had as yet arrived in the police station. The police officer said he would check, but he never came back to tell the defendant whether or not his mother was present. The court acknowledged that the statute does not require a juvenile officer be present under the circumstances as presented in that case, but held that the failure to have a juvenile officer present was material to determining the voluntariness of defendant's statement. Knox, 186 Ill.App.3d 808, 134 Ill.Dec. 564, 542 N.E.2d 910.
We feel that Knox is factually distinguishable from the present case. D.C. was advised of his Miranda rights and he stated that he understood them. Although the youth officer did not identify himself, he was present and testified that D.C.'s rights were not violated. D.C. testified that he was aware he could have his mother present.
In People v. Bobe (1992), 227 Ill.App.3d 681,169 Ill.Dec. 814, 592 N.E.2d 301 at 315, the court, distinguishing Knox, recently stated:
"Thus, Knox does not mandate that a juvenile be allowed to speak with his parents and a juvenile officer, and it also does not require that a concerned adult be present every time a juvenile is questioned. As the court expressly stated, the defendant in Knox was not allowed to confer with any adult interested in his welfare before being questioned. Indeed, the Knox court distinguished the facts before it from those in People v. Stachelek (1986), 145 Ill.App.3d 391, 99 Ill.Dec. 249, 495 N.E.2d 984, noting that although the parents of the defendant in Stachelek were not notified of his arrest, the defendant `was afforded the opportunity to confer with a youth officer, an adult interested in his welfare, prior to making any statement.' [Citation.] The Knox court observed that this distinction between the facts before it and those of Stachelek was `crucial.' [Citation.]"
In Bobe the youth officer was present during the defendant's first interview, but the youth officer was not present when the defendant was questioned. The appellate court noted that the trial judge made his decision that the evidence established that the statement was voluntary and found that the decision was not against the manifest weight of the evidence. People v. Bobe, (1992), 227 Ill.App.3d 681, 169 Ill.Dec. 814, 592 N.E.2d 301 at 316.
The Bobe court also found that the scene at the police station was very active. Although, the defendant had been left handcuffed, alone and unfed in a room for several hours, the court noted that under the circumstances, a fact finder could conclude that the police did not wilfully neglect the defendant in an attempt to wear down his resistance. (People v. Bobe (1992), 227 Ill. App.3d 681, 169 Ill.Dec. 814, 592 N.E.2d 301.) The trial court in the present case found that the scene at the station was hectic and that there was no evidence that the police purposefully excluded the parents of the boys. We find that the record supports the trial court's finding.
In the present case, the defendant admitted that he was advised of his Miranda rights. D.C. also testified at the suppression hearing that he was aware that he could have his mother present during questioning. However, he never requested to have his mother present. Although the youth officer did not identify himself, he was present. The youth officer testified at trial that the defendant's rights were not violated and the statement was not coerced.
During the motion to suppress 18 witnesses were presented. The trial judge asked questions to clarify points. In rendering its decision the trial court issued a 31-page memorandum opinion on the motions. The trial court considered all of the circumstances surrounding D.C.'s statement, including the fact that a parent was not present during questioning. Under the totality of the circumstances surrounding the the custodial interrogation of D.C., we believe the trial court's denial of D.C.'s motion to suppress his court reported statement was not against the manifest weight of the evidence.

*1146 TRIAL
Both the State and the defense waived opening arguments. The trial court received stipulations that (1) Amiri Tutwiler died on December 20, 1987, (2) fire department paramedic Sam Clerk would identify photographs of the deceased, and (3) Michael Chambliss, M.D., and Michael Schaeffer, Ph.D., would testify in accordance with their written post mortem exam and toxicology analyses.
Youth Officer Radigan was the only witness called to testify on behalf of the State. He testified that he was present on January 13, 1988, at area two headquarters, while a statement was taken from D.C. Officer Radigan witnessed D.C. initial and sign each page of his statement. Officer Radigan testified that neither he nor anyone in his presence struck or intimidated D.C.
The statement given by D.C. was then read into the record. D.C.'s statement related that on December 20, 1987, he was on the corner of 82nd and Ellis. He was coming out of a store when he heard someone calling his name from a van across the street. He ran over to the van and he and his friend D. got in the van. A number of other boys were in the van. The boys all belonged to the Disciples. D.C. stated that he belonged to that gang. They saw and chased, but failed to catch a Vice Lord member at 75th and Cottage Grove. Sometime later they chased and caught the decedent, Amiri Tutwiler. Amiri Tutwiler had his hat turned to the left. That was a sign that he was a member of the rival Vice Lord gang. One of the boys came out with a bat. Subsequently, the boys all got back in the van and rode in it to where the decedent was at. Everybody jumped out of the van again. When D.C. caught up with the decedent he was already on the ground. D.C. testified he hit the decedent twice with his fists and kicked him in the shoulder, and that he saw others hit and kick the decedent numerous times, and strike the decedent with a baseball bat. D.C. stated that no one made any threats or promises to him in order to induce the statement. The State then rested their case in chief.
D.C. was called to the stand by defense counsel. D.C. testified that he hit and kicked the deceased out of fear of being beaten by others of the party if he didn't. He further testified he was not a gang member and did not intend to kill the decedent. Defense counsel offered a stipulation that if Dr. Chambliss were called to testify, he would testify that "any striking of the shoulder of Amiri Tutwiler by [D.C] was not fatal." In closing argument counsel argued that D.C. did not intend to kill the decedent, was forced to strike the decedent out of his fear of the other juveniles, and was not a gang member.
Upon hearing D.C.'s in-court admission to hitting and kicking the decedent and his counsel's closing argument the trial court commented, "I'm not quite sure I understand what the theory of the defense is in this case." The trial court specifically informed defense counsel that (1) the State was not required to prove a specific intent to kill in order to sustain a murder conviction, (2) compulsion is not a defense to murder in Illinois, and (3) D.C.'s gang status or lack of same was irrelevant. The trial court noted that, "the defense has offered no defense at all," and entered a finding of delinquency as to the count of first degree murder. The court made the defendant a ward of the court, citing the brutal nature of the offense.
D.C. contends on appeal, that he was denied effective assistance of counsel. He argues that his trial counsel failed to subject the prosecution's case to meaningful adversarial testing by waiving opening argument, failing to cross-examine any of the State's witnesses, and then by putting D.C. on the stand to tell the trier of fact that he had personally taken part in the fatal beating of Amiri Tutwiler.
In People v. Albanese (1984), 104 Ill.2d 504, 526, 85 Ill.Dec. 441, 473 N.E.2d 1246, the Illinois Supreme Court adopted the standard for incompetence of counsel set out in Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. The test is a two pronged test. First, the defendant must prove that his counsel made errors so serious, and his *1147 performance was so deficient that he was not functioning as the "counsel" guaranteed the defendant by the sixth amendment of the United States Constitution. Second, the defendant must prove these deficiencies so prejudiced the defendant as to deprive him of a fair trial, a trial whose result is reliable. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.
A reviewing court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and avoid interfering with the constitutionally protected independence of counsel or restricting counsel's wide latitude in making tactical decisions. (People v. Colley (1988), 173 Ill.App.3d 798, 123 Ill.Dec. 678, 528 N.E.2d 223.) The adequacy of counsel's performance is to be determined on the basis of the totality of his conduct at trial rather than on isolated events or acts. (Colley, 173 Ill.App.3d at 809, 123 Ill.Dec. at 689, 528 N.E.2d at 231.) A defendant is entitled to competent, not perfect, representation. People v. Nutall (1980), 91 Ill.App.3d 758, 47 Ill.Dec. 623, 415 N.E.2d 628.
It is well settled that a review of counsel's competence does not extend to areas involving the exercise of judgment, discretion and tactics. (People v. Baer (1976), 35 Ill.App.3d 391, 342 N.E.2d 177.) The decision to make or waive an opening statement is a matter of trial strategy (People v. Jennings (1986), 142 Ill.App.3d 1014, 97 Ill.Dec. 164, 492 N.E.2d 600), as is the decision to cross-examine a witness. Moreover, a client must accept the consequences of the lawyer's decision to forgo such trial practices as cross-examination. Taylor v. Illinois (1988), 484 U.S. 400, 418, 108 S.Ct. 646, 657, 98 L.Ed.2d 798, 816.
D.C. argues that defense counsel put respondent on the stand to testify that he had personally taken part in the beating of the victim. The following is an excerpt from D.C.'s testimony:
"MR. HICKS [Defense Counsel]: Q. I show you the statement. Would you look at page 4. This is a copy of that statement; isn't it. Is this a copy of that statement?
A. [D.C] Right.
Q. Okay. Look at page 4. And you see there where there is an answer first of no? That's scratched out and then next to it is the answer, `yes,' written in. Do you see that?
A. Right.
Q. The question was, `Do you belong to any gang?' Did you understand that?
A. Yes.
Q. Now who scratched out the `no' and wrote the, `yes.'
A. I did.
Q. You did?
A. Yes.
Q. Speak up so I can hear you.
A. Yes.
Q. Now, who struck out this next question, `Have you ever?'
A. I don't understand the question.
Q. So you see where underneath the, `no,' where those are stricken out; do you see underneath there were some moreare words that are stricken out?
A. Yes.
Q. In fact there are two lines of words stricken out. Do you see that?
A. Yes.
Q. Who struck those lines?
A. I did.
Q. And then under that skip two more lines and the word Vice Lord is stricken out, and Disciples, D-e-c-i-p-l-e-s is written next to that?
A. Yes.
Q. Did you write the word desciples?
A. Yes.
Q. Now, did you make those changes of yes and Disciples?
A. Yes.
Q. So your original answer was no that you did not belong to a gang; isn't that correct?
A. Yes.
Q. What is the reason that you changed it to yes?
A. Because I was told if I would cooperate and would tell them what they wanted to hear, that I would be able to go home.

*1148 Q. Did you believe that they wanted to hear that you were a gang member?
A. Yes.
MR. COMROE: Objection to what he believes they wanted to hear.
THE COURT: Answer the question. Overruled.
THE WITNESS: Yes.
MR. HICKS: Q, Did you believe they wanted to hear that you were Disciples?
A. Yes."
The evidence presented at trial confirmed that the cause of Amiri Tutwiler's death was a beating and further that no single blow caused the death. D.C. gave a court reported statement to ASA Shields, admitting his participation in the event. D.C. signed each page of the court reported statement and this statement was read into evidence. The State's main evidence against D.C. was own words; his signed court reported statement. Clearly, the above line of questioning was intended to attack the veracity of this statement. At trial D.C. testified that he gave the statement because he was told he would be able to go home if he told them what they wanted to hear. Defense counsel was attempting to offset the devastating effect of the prosecution's most damaging evidence.
Defense counsel argued the theory of compulsion, which is not a defense in Illinois. When arguing the theory of compulsion, defense counsel knew he had lost the motion to suppress the court reported statement and that the statement was read into evidence. The State argues and we agree, that defense counsel could have been making a tactical decision, looking ahead to the argument in mitigation in order to win a lighter sentence for D.C.
In People v. Ganus (1992), 148 Ill.2d 466, 594 N.E.2d 211, defendant contended that his counsel labored under the misconception that compulsion was an available defense. Defense counsel offered evidence of compulsion. The court held that regardless of defense counsel's intentions regarding compulsion, this evidence was relevant as mitigation, and its use as such was defense counsel's principle reason for eliciting it. (People v. Ganus (1992), 148 Ill.2d 466, 594 N.E.2d 211.) The choice of evidence to present is a matter of trial strategy to which a court considering a claim of ineffective assistance will normally defer. Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674, 694-95; People v. Barrow (1989), 133 Ill.2d 226, 247, 139 Ill.Dec. 728, 549 N.E.2d 240.
After a review of the totality of defense counsel's performance we do not find that D.C. received ineffective assistance of counsel. Defense counsel argued and won motions to suppress D.C.'s statements given at the time of his arrest and statements given when he was brought to area two headquarters. Defense counsel argued and lost a motion to quash the arrest and a motion to suppress the oral and court reported statements given at approximately 11 p.m. on January 13, 1988. At trial defense counsel argued for a directed verdict at the close of the State's case, presented D.C.'s testimony that the his confession was coerced and gave a closing argument. After the trial judge found defendant guilty, defense counsel filed a motion for a new trial. Defense counsel's actions cannot be characterized as unreasonable under the first prong of the Strickland standard.
The Illinois Supreme Court stated in People v. Johnson (1989), 128 Ill.2d 253, 271, 131 Ill.Dec. 562, 569, 538 N.E.2d 1118, 1125:
"Claims of ineffective assistance of counsel may be disposed of on the ground that the defendant suffered no prejudice from the claimed errors, without deciding the first prong, whether the errors were serious enough to constitute less that reasonably effective assistance. [Citation.] Under the second prong of Strickland the defendant must show that there is a `reasonably probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.' [Citation.]"
Even if any of the alleged improprieties had constituted unprofessional errors, we find nothing in the record to suggest a prejudice to D.C. as a result of his counsel's trial tactics. The evidence against D.C. was overwhelming. D.C.'s statement *1149 incriminating himself was read into evidence. Medical testimony corroborated that Amiri Tutwiler was beaten to death. Therefore, we find that the second prong of the Strickland test was not established. We conclude that defendant was not denied effective assistance of counsel.
Where counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, there has been a denial of sixth amendment rights that makes the adversary process itself presumptively unreliable. Defendant argues that his trial counsel's actions in the present case constitutes a failure to subject the prosecution's case to a meaningful adversarial testing and, under People v. Hattery (1985), 109 Ill.2d 449, 94 Ill.Dec. 514, 488 N.E.2d 513 and People v. Chandler (1989), 129 Ill.2d 233, 242, 135 Ill.Dec. 543, 543 N.E.2d 1290 his conviction must be reversed.
In People v. Hattery (1985), 109 Ill.2d 449, 94 Ill.Dec. 514, 488 N.E.2d 513, the Illinois Supreme Court held that the defense counsel's performance was per se ineffective. In Hattery, the defendant had pled not guilty to a murder charge. Defendant's trial counsel, in an effort to avoid the death penalty, admitted defendant's guilt in his opening statement, failed to advance any theory of defense, attempted to establish on cross-examination that the defendant was compelled to kill victims and failed to make a closing argument. The Illinois Supreme Court found the prosecution's case was not subjected to the "meaningful adversarial testing" required by the sixth amendment and granted the defendant a new trial regardless of the overwhelming proof of guilt. Hattery, 109 Ill.2d at 464, 94 Ill.Dec. 514, 488 N.E.2d 513.
In People v. Johnson (1989), 128 Ill.2d 253, 269, 131 Ill.Dec. 562, 538 N.E.2d 1118 the Illinois Supreme court stated that Hattery did not hold that it is per se ineffectiveness of counsel whenever an attorney concedes his client's guilt to offenses and the record fails to show the client's consent. The court noted that "if a concession of guilt is made, ineffectiveness may be established; however, the defendant faces a high burden before he can forsake the two part Strickland test." Johnson, 128 Ill.2d at 269-70, 131 Ill.Dec. 562, 538 N.E.2d 1118.
In People v. Ganus, the Illinois Supreme Court noted that it was aware of some similarities between that case and Hattery. However, in distinguishing Hattery, the court found that the defendant in Ganus literally had no defense and the evidence of his guilt was overwhelming. The court also stated:
"His counsel conceived a compulsion defense which, though not a legal defense, could or might have persuaded a jury not to convict. * * * A weak or insufficient defense does not indicate ineffectiveness of counsel in a case where a defendant has no defense." People v. Ganus, (1992), 148 Ill.2d 466, 594 N.E.2d 211, at 214.
Defense counsel presented various pretrial motions. As previously stated, the defendant's statement was read to the jury prior to D.C. taking the stand. Defense counsel did not elicit any incriminating statements from D.C. that were not already admitted in D.C.'s court reported statement. After a careful review of the record we do not find that defense counsel's performance in this case was per se ineffective so as to disregard the twopronged Strickland test.
Accordingly, for all the reasons set forth above, we affirm the decision of the trial court.
JUDGMENT AFFIRMED.
McNULTY, P.J., and GORDON, J., concur.