THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. M.S., a Minor, Defendant-Appellant.

First District (1st Division) No. 1—90—1086

Opinion filed June 14, 1993.

Rita A. Fry, Public Defender, of Chicago (Michaela J. Kalisiak, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Following a bench trial in juvenile court, defendant M.S. was found delinquent on a charge of criminal sexual abuse. The trial judge adjudicated defendant a ward of the juvenile court of Cook County and placed defendant on two years' probation with mandatory counseling. Defendant presents three arguments on appeal. First, defendant argues that his fifth amendment rights were violated by the psychologically coercive questioning practices of the police. Second, defendant urges that, in situations where a minor is accused of a crime, a higher standard should be required in custodial situations which absolutely prohibits the minor from making incriminating statements without the advice of and in the presence of an attorney. Finally, defendant asserts that the trial judge committed reversible er-

ror when he allowed the victim's mother to testify as to the victim's statements to her regarding the alleged sexual abuse.

At the time of the alleged incident, defendant was 12 years old and living with his divorced mother and his 10-year-old younger brother, J.S. On September 28, 1989, at approximately 7:30 p.m., police officers arrived at their house and took defendant and J.S. into custody for the alleged sexual assault of A.H., a three-year-old girl. At first, defendant denied assaulting A.H. Several minutes later, however, defendant made an incriminating statement. Defense counsel filed a motion to suppress defendant's incriminating statement and a hearing was held on the motion.

### HEARING ON THE SUPPRESSION MOTION

Officer James Glynn testified that, on September 28, 1989, he was the Area Two youth officer assigned to the fourth district when defendant and J.S. were brought into the station. According to Glynn, he first informed defendant of the charge against him. He then read defendant his *Miranda* rights from his FOP handbook. Glynn stated that he read the warnings to defendant one at a time and attempted to explain each one to him. According to Glynn, after each warning was read, defendant indicated that he understood it. Glynn denied using any sort of physical or mental coercion on defendant and asserted that he attempted to contact defendant's parents within minutes of his and his brother's arrival at the station. He stated that he called defendant's mother several times, but received no answer. He also attempted to call defendant's grandmother, but similarly did not get a response. Defendant did not know his father's phone number so, according to Glynn, he called 411 but was told that there was no listing. He admitted he did not check the phone book.

Glynn testified that after defendant and J.S. had been at the station approximately 1½ hours, Detective Butler and Detective Egan arrived. Butler took defendant to an interview room while Egan spoke with J.S. in another interview room. Glynn estimated that defendant spoke with Butler for approximately 5 or 10 minutes. Glynn stated that, since the boys did not have previous police records, he did not want to leave them in a detention center overnight. He was unable, however, to contact their parents. Glynn asserted that, at approximately 11:30 p.m., he dropped the boys off with their grandmother, who had just returned home.

Detective James Butler testified that he arrived at the station on September 28, 1989, at approximately 9 p.m. to interview defendant about the allegations against him. He stated that prior to speaking

with defendant he had seen the victim at St. Margaret's Hospital. He stated that upon arriving at the station he had defendant accompany him into an interview room. According to Butler, he then read defendant his *Miranda* rights and defendant verbally responded that he understood those rights. Butler estimated that it took approximately 5 to 10 minutes for him to read defendant his *Miranda* warnings and for defendant to make his incriminating statement. According to Butler, after defendant had made the statement, he took him back to Glynn and defendant repeated the statement to him. Butler denied forcing or coercing defendant into giving the statement.

On cross-examination, Butler admitted that at first defendant denied assaulting A.H. He also admitted that he "probably" responded to defendant's denial by telling defendant that he did not believe him. Butler denied telling defendant, however, that he had a medical report or that he had other evidence proving defendant's guilt. He also denied saying to defendant "if you don't tell me what I want to hear, you are not going home." Butler said he was aware that the FOP book suggests that, when interviewing a minor, a parent or guardian should be present. Additionally, he was aware that the Juvenile Court Act of 1987 (Ill. Rev. Stat. 1991, ch. 37, par. 801—1) requires that the police "make prompt reasonable efforts to inform the parent, custodian, [or] guardian" that his or her minor child has been taken into custody. He asserted, however, that attempts were made to contact a parent, but those attempts were unsuccessful because no one was home.

J.S. then testified for the defense. He stated that, on September 28, 1989, at approximately 7:45 p.m., he and defendant were home alone when three police officers came to their door. According to J.S., four to six more police officers were outside the house along with three or four police cars and a paddy wagon. He stated that the officers placed them in the paddy wagon and drove them to the fourth district police station. He said that Glynn was doing paperwork and did not speak to them for 40 to 45 minutes. Glynn then asked them questions, but J.S. did not remember what kind of questions. He stated that an officer then took defendant into another room, but he could hear the voices. According to J.S., the officer told defendant that they would "be able to leave the police station if you tell me what I want to hear."

Michael Sucacin, defendant's father, testified that he did not receive any phone calls from the police on the night of September 28, 1989. He stated that his number is listed in the phone book as well as in the 411 directory. He testified that, although he was not home be-

tween 7 p.m. and 10:30 p.m., his father was there all night and did not receive any phone calls.

Defendant testified that he and J.S. sat in the police station for about 45 minutes before Glynn spoke to them. He stated that when Glynn first spoke to them he asked them for their names, their address, and their ages. According to defendant, Glynn read them their *Miranda* rights approximately 20 minutes into the questioning. Defendant said that all the rights were read to them at once and not one at a time. Defendant stated that, when Glynn was finished reading them all the rights, he said he understood them. Defendant stated, however, that when Glynn told him he had a right to an attorney, defendant understood him to mean that he had a right to speak with an attorney in court; he did not realize that he had a right to an attorney at that time.

Defendant testified that Butler then arrived and took him into another room to speak to him about the case. Defendant stated that Butler told him he had a medical report and that he knew defendant "had raped the little girl." According to defendant, he responded that "there was no way because I didn't take off her bathing suit" and Butler told him he was lying. Defendant stated that Butler then told him that he would not be able to go home unless he told him what he wanted to hear. Defendant testified that at that point he had been at the police station for approximately 2½ hours and was tired and frightened. It was then that he fabricated the incriminating statement in order to go home.

On cross-examination, defendant said that Butler had a file from St. Margaret's Hospital and that he saw two pictures in the file of A.H.'s stomach. He said he knew that the file was from the hospital because at the top of the file it said "St. Margaret's Hospital." Defendant stated that the door remained open throughout the 5- or 10-minute interview.

Throughout the hearing on the motion to suppress, the judge stringently restricted all the witnesses from testifying to the substance of any of defendant's statements. He repeatedly admonished that the hearing was being held to determine the admissibility of the statements and not the substance of the statements or their truth or falsity. The judge also commented that defendant appeared "rather articulate" and intelligent.

The judge denied defendant's motion to suppress. He held that, by defendant's own admission, he was read his *Miranda* rights and told the officers he understood those rights. He determined that defendant was an articulate and intelligent young man with the capacity to un-

derstand the officers. The judge also concluded that there was no physical, psychological, or mental coercion. The judge did not believe that the number of police officers at defendant's home when he and his brother were taken to the police station or that the manner in which he was transported to the station was coercive. Additionally, the judge stated that, although defendant did not speak to his parents or other responsible guardian, it is not illegal to question a minor without his parents present, especially when a youth officer is present. Further, he said he did not believe that Butler told defendant he could not leave unless defendant told him what he wanted to hear. He also concluded that defendant's statement was not obtained as the result of confronting defendant with material misrepresentations of fact concerning the medical report.

THE TRIAL

The first witness at trial was Hind Haddad, the mother of A.H., the victim. She testified that, on September 28, 1989, at approximately 6:30 p.m., A.H., who was three years old at the time, was outside playing with her five-year-old brother Tony in front of the house. Hind said she was inside the house with her four-week-old baby and was keeping an eye on Tony and A.H. through the open front door. At approximately 6:45 p.m., Tony came inside to use the bathroom. According to Hind, after Tony came out of the bathroom, she asked him where A.H. was and he said she was in the front playing. Hind and Tony went outside to look for A.H., but she was not in front of the house where they usually play with the other kids. Hind then walked all the way around the block calling for A.H., but received no answer. She returned home and called her brother-in-law to come over and help her search for A.H.

She went outside again to continue searching while she waited for her brother-in-law to arrive. Hind saw A.H. coming out of the side door of a home down the block from her house. According to Hind, A.H. was screaming, crying, and calling "mommy, mommy." She ran to A.H. and picked her up. Hind testified that A.H.'s face was tear stained, her hair was messed up, and three buttons on the back of her dress were unbuttoned. She stated that A.H. was wearing a white and red dress with a one-piece bathing suit underneath the dress. According to Hind, she had closed those buttons when she put the dress on A.H. that morning and A.H. was incapable of dressing herself in that dress.

When she picked A.H. up, Hind said she asked A.H. what happened. According to Hind, A.H. pointed at the door of the house she

had just exited and responded in Arabic that "a big boy had his penis in here and in here" and then she pointed at her vagina and her mouth. Defense counsel objected at this point on the grounds that whatever A.H. allegedly said is hearsay. The trial judge overruled the objection and held that, under the circumstances of the case, any statement by the three-year-old child would be a spontaneous declaration and, therefore, an exception to the hearsay rule.

According to Hind, she then ran home with her daughter in her arms and called the police. At the house, she asked A.H. again to explain to her what happened. Again, defense counsel objected on the grounds that A.H.'s alleged statement at her home was a narrative and could not be categorized as a spontaneous declaration. The trial judge also overruled this objection and concluded that, in light of A.H.'s age, these statements also were spontaneous declarations. According to Hind, A.H. told her that "the big boy" asked her to come into his house and he would give her some gum. When she went into the house, the big boy and his brother took her to a bedroom, took off her dress and bathing suit and placed her on a bed. Hind testified that A.H. told her that the big boy then tried to kiss her on the face and he put his penis in her vagina and in her mouth. They then dressed A.H. and let her leave. According to Hind's testimony, when the police arrived A.H. repeated to the officer what had happened.

Later in the day, Hind took A.H. to the emergency room at St. Margaret's Hospital. Hind testified that, while the doctors were examining A.H., Hind noticed two scratches on the right side of A.H.'s abdomen that were not there when she dressed A.H. that morning.

While defense counsel was conducting cross-examination, the parties stipulated to the content of the medical report. According to the medical report, A.H. initially was playful and smiling, but when the doctor was about to examine her "she got scared and became very uncooperative and [would not] hold still even with two nurses holding her down." The doctor considered the possibility of examining A.H. after placing her under anesthesia. The medical record indicates that both vaginal and oral swabs were taken and no lacerations or other physical evidence of child molestation was present.

Butler then took the stand and testified to the substance of the statement that defendant gave to him at the police station. Butler stated that he did not have any documents with him when he interviewed defendant. He stated that defendant first denied assaulting A.H., but then gave his version of events that day. According to Butler, defendant told him that he was returning from football practice when A.H. began following him home. Defendant told him that she

was scratching herself. Butler stated that defendant wanted to discover why she was scratching herself so he took off her clothes. Butler testified that defendant said he became excited and so he took his penis out of his pants and rubbed it on her vagina and then by her mouth, but he did not put it in her mouth because he was afraid she would bite him. He said he then dressed her and she left. Butler testified that, after questioning defendant, he led him out of the interview room and back to youth officer Glynn. He stated that defendant then repeated his incriminating statement to Glynn.

On cross-examination, Butler admitted that he did not speak directly to A.H. at the hospital, but that everything she said had to be translated into English by her mother. Defense counsel also brought out the fact that Butler never included in his report that defendant had placed his penis on A.H.'s lips. In the report, Butler had only written that defendant was going to put his penis in her mouth, but he did not because he was afraid she would bite it. On re-cross-examination, Butler admitted that the fact of whether or not defendant actually touched A.H.'s mouth with his genitals was "very important."

J.S. testified that on September 28, 1989, at approximately 7 p.m., he saw defendant from the other side of the street walking home from football practice wearing his football uniform. He stated that A.H. was following defendant down the street. He saw defendant walk A.H. back toward her home and then turn and proceed back to their house. A.H. kept following him. When J.S. arrived home, A.H. was in the gangway and he and defendant walked A.H. back toward her house. According to J.S., they returned home and turned on the television. Several minutes later, they heard a knock on the door and discovered it was A.H. According to J.S., A.H. was holding her stomach and complaining that her stomach hurt. J.S. testified that defendant told her he would feel her stomach and see if there was anything wrong. J.S. stated that they then took A.H. to their mother's room and placed her on the bed. According to J.S., his brother took off A.H.'s dress and felt her stomach for a lump. He did not feel anything and told A.H. to put on her dress and they had her leave. He said that they never removed A.H.'s bathing suit. He said he was with defendant the entire time A.H. was in the house and that defendant never took off his pants or removed his penis from his pants.

Defendant testified that, on September 28, 1989, he was returning home from football practice when he realized A.H. was following him. He stated that he tried to get rid of her several times by walking her back toward her house, but she kept following him. Finally, at approx-

imately 7 p.m., when he thought he had gotten rid of A.H., defendant entered his home. His brother arrived about 20 seconds later and they began to watch television. According to defendant, while they were watching cartoons, they heard a tapping at the door. Defendant stated that J.S. followed him to the door, where they found A.H. moaning that her stomach hurt. Defendant stated that he thought there might be something wrong with her, so he and J.S. took A.H. to their mother's bedroom. They could see that she was wearing a bathing suit under her dress. According to defendant, he removed her dress in order to check her stomach, but he did not take off her bathing suit. He testified that he did not feel a lump or anything peculiar. He and J.S. then dressed A.H. and let her out the hall door. They did not walk her home. He testified that A.H. was in the house for approximately five minutes. He denied ever taking his pants off or allowing his penis to stick through his pants at anytime.

Defendant testified that the police arrived later that night and took him and J.S. to the police station. He said he told Butler the same story he related in court. According to defendant, Butler told him he was lying and that he had seen punks like him before and was not going to take any crap. Defendant stated that Butler told him he had medical reports proving that he sexually assaulted A.H. Defendant testified that he told Butler "there is no way because I didn't do nothing." He said Butler responded by threatening that if he did not tell him what he wanted to hear, he would not be allowed to go home. Defendant testified that at that point he made the incriminating statement up "out of the blue." He said he had to tell Butler something because otherwise he could not go home. On rebuttal, Butler denied making these statements or ever threatening to keep defendant at the station until he told him what he wanted to hear.

The trial judge held that, although the evidence supported a finding of aggravated criminal sexual assault, due to defendant's age, he would "give the minor the benefit of finding him delinquent on a charge of criminal sexual abuse." The judge then adjudicated defendant a ward of the juvenile court of Cook County and sentenced him to two years' probation with mandatory counseling. Further, the judge ruled that, in the future, if it were deemed appropriate, the second year of probation could be vacated.

Defendant argues that the trial judge committed reversible error when he denied defendant's motion to suppress and concluded that defendant's incriminating statement was voluntary. He asserts that the atmosphere surrounding his admission was psychologically coercive and that Butler purposely arranged his interview so he would not

be able to consult with an attorney, his parents, or a concerned youth officer. The State, on the other hand, contends that this argument is without merit and maintains that defendant, by his own admission in court, was read his *Miranda* rights and said he understood them.

When determining whether a statement by a juvenile was voluntarily given to the police, Illinois courts utilize the same "totality of the circumstances" test that they use to determine the voluntariness of an adult's statement. (*People v. Knox* (1989), 186 Ill. App. 3d 808, 812, 542 N.E.2d 910, 913.) Any statement to the police, by an adult or a minor, must be given "freely, voluntarily and without compulsion or inducement of any sort" and the defendant's will must not have been overcome. (*People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, 606; *People v. Stachelek* (1986), 145 Ill. App. 3d 391, 401, 495 N.E.2d 984, 990.) The court must consider " 'both the characteristics of the accused and the details of the interrogation.' " (*People v. Simmons* (1975), 60 Ill. 2d 173, 179, 326 N.E.2d 383, 386, quoting *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 226, 36 L. Ed. 2d 854, 862, 93 S. Ct. 2041, 2047; *Knox*, 186 Ill. App. 3d at 812, 542 N.E.2d at 913.) In determining whether a statement was voluntary, the court considers the totality of all the relevant circumstances, including "the existence of any threats, promises, or physical coercions; the length and intensity of the interrogation; and the age, intelligence, experience and physical condition of the defendant." (*Stachelek*, 145 Ill. App. 3d at 401, 495 N.E.2d at 990.) When a statement is elicited from a minor, whether the minor's parents were present is another factor to be considered in determining whether the surrounding circumstances were coercive. *People v. Brown* (1989), 182 Ill. App. 3d 1046, 1053, 538 N.E.2d 909, 913; *Stachelek*, 145 Ill. App. 3d at 402, 495 N.E.2d at 991.

We recognize that eliciting an incriminating statement from a minor "is a sensitive concern and the greatest care must be taken to ensure that it is voluntary." (*Brown*, 182 Ill. App. 3d at 1052, 538 N.E.2d at 912.) In such a case, therefore, the circumstances surrounding the statement must "be scrutinized with special care" (*Stachelek*, 145 Ill. App. 3d at 401, 495 N.E.2d at 991) in order to guarantee " 'not only that [the statement] was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.' " (*People v. Prude* (1977), 66 Ill. 2d 470, 476, 363 N.E.2d 371, 373, quoting *Simmons*, 60 Ill. 2d at 180, 326 N.E.2d at 386.) Finally, we note that weighing the credibility of witnesses is for the trial court (*Brown*, 182 Ill. App. 3d at 1051, 538 N.E.2d at 912), and a judge's finding that a minor's statement was

voluntarily given will not be disturbed on appeal unless it is against the manifest weight of the evidence. *People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, 606; *Stachelek*, 145 Ill. App. 3d at 401, 495 N.E.2d at 990.

■ Defendant maintains that the totality of all the relevant circumstances clearly shows that he was psychologically coerced into making the incriminating statement. He maintains that his *Miranda* rights were not sufficiently explained to him and that he did not understand that he had a right to consult an attorney at that moment, but assumed the officers meant at trial. It is clear from the record that defendant was read his *Miranda* rights several times and he told the officers he understood them. Several times during the trial and at the sentencing hearing, defendant's use of language and his clear and responsive answers to questions caused both the trial judge and the prosecutor to comment upon defendant's intelligence. At one point, the trial judge commented that defendant was probably the most intelligent boy he had seen in his courtroom in the 15 months he had been sitting in juvenile court. Although both defendant and J.S. impressed the judge as being intelligent and articulate, however, he stated that he did not find them to be "truthful." It is the province of the trial judge to determine the credibility of witnesses and weigh conflicting testimony. (*People v. Wicks* (1992), 236 Ill. App. 3d 97, 107, 603 N.E.2d 594, 600.) Clearly, the judge did not believe defendant when he testified that he did not understand he was entitled to an attorney at that moment and we cannot say that that determination is against the manifest weight of the evidence.

Defendant also argues that Butler misrepresented the medical evidence against him and threatened that defendant would not be allowed to go home unless he confessed to the assault. However, Butler denied ever threatening defendant or telling him that there was medical proof of his guilt. Again, the court chose to believe the officer and defendant does not point to anything in the record which establishes that the officer was lying. The trial judge specifically found defendant's testimony not to be credible and held that he did not believe that Butler threatened defendant or coerced him into confessing.

Defendant also contends that youth officer Glynn was not concerned with his welfare and that Glynn could have contacted his father if he had merely checked the phone book. The assertion that the youth officer was not concerned with defendant's welfare is unsupported by the facts or testimony. In fact, if anything, these facts show Glynn to be a concerned officer. After being unable to contact the boys' mother, father or grandmother, he could have left them in a de-

tention center overnight. Instead, he drove the boys to their grandmother's home and left them there with her when she arrived home. Moreover, even assuming *arguendo* that Glynn made no attempt to contact defendant's father, this fact does not establish conclusively that defendant's incriminating statement should be suppressed. (*Stachelek*, 145 Ill. App. 3d at 402, 495 N.E.2d at 991.) The presence or absence of a parent when a minor makes a statement to the police is merely a factor to be considered when determining if the surrounding circumstances were coercive. *Stachelek*, 145 Ill. App. 3d at 402, 495 N.E.2d at 991.

In this case, we do not believe that the absence of defendant's father contributed to a coercive atmosphere. When defendant and his brother were brought to the station, they were not converged on by numerous police officers and questioned, but were left with Glynn. Glynn did not interrogate the boys, but asked them for their phone number and for the phone number of their father and grandmother so he could contact a relative. The record shows that neither the boys' mother nor grandmother was home. Moreover, at trial, the boys did not contradict Glynn's testimony that they did not know their father's phone number. Glynn testified he called 411 and was told that no number was listed for defendant's father. Glynn also allowed defendant to use the bathroom and gave him some water. Defendant testified that he was "terrified," yet while waiting to be questioned, he fell asleep, hardly an act to be expected from a person who feels trapped in a coercive and frightening environment. Additionally, when Butler arrived and spoke with defendant, he left the door of the interview room open. By all accounts, the interview spanned no more than 5 or 10 minutes. Finally, rather than leaving the boys in a detention center for the night, Glynn drove them to their grandmother's home.

Only the circumstances surrounding defendant's arrest tend to show a coercive atmosphere. Apparently, when defendant and J.S. were arrested, four to six police officers were outside their house along with three or four police cars and a paddy wagon. Defendant asserts that sending this "small army" to arrest two children was done intentionally in order to maximize the coercive atmosphere of the subsequent interview. First, the officers could not have known they were arresting two children when they responded to the call and arrived at the scene. Assuming they did know the suspects were children, they could not have known that their mother was not home. It is absurd to argue that the atmosphere surrounding the arrest was intentionally manufactured in order to terrorize two children. Nonetheless, we do not believe that the circumstances surrounding the arrest,

standing alone, were so psychologically coercive as to cause defendant to confess several hours later.

Defendant argues that the facts of this case are similar to those in *People v. Knox* (1989), 186 Ill. App. 3d 808, 542 N.E.2d 910. We believe *Knox* is distinguishable. In *Knox*, the minor defendant's mother was at the police station within an hour of her son's arrest, but was precluded from seeing him before the officers had elicited a confession. Additionally, defendant was not "afforded the opportunity to confer with a youth officer, an adult interested in his welfare, prior to making any statement." (*Knox*, 186 Ill. App. 3d at 814, 542 N.E.2d at 914.) The *Knox* court reasoned that the conduct of the police was inconsistent with the "great care" required to guarantee that defendant's statement was voluntary and concluded that the absence of an opportunity to speak with an adult interested in his welfare "contributed to the coercive circumstances surrounding the interview." *Knox*, 186 Ill. App. 3d at 814, 542 N.E.2d at 914.

In the instant case, defendant did have an opportunity to speak to a youth officer. Additionally, the officers testified that they attempted to contact defendant's mother, father, and grandmother. Defendant did not contradict this testimony or show that these relatives were home. In view of all the circumstances surrounding the giving of defendant's statement, we do not believe that defendant's failure to speak to a relative prior to being questioned contributed to a coercive environment. Therefore, after a careful review of the record and an analysis of the relevant factors surrounding the making of the incriminating statement under the totality of the circumstances test, we cannot say that the trial judge's conclusion that defendant's statement was not coerced is against the manifest weight of the evidence.

Defendant, however, also urges us to adopt a new higher standard for determining whether a confession made by a minor is voluntary. Defendant argues that children are a protected class in Illinois and, in support of his argument, lists numerous laws which protect minors from the inexperience of youth. Among other rules, defendant points out that a contract entered into by a minor is generally voidable and that a minor cannot drink, vote, or drive a car. He argues that a child can have no understanding of how a waiver of his *Miranda* rights will impact upon him later in court and in his future life and, therefore, maintains that the State should not be allowed to use any statements which were given by a minor without the advice and in the presence of an attorney.

The State, on the other hand, contends that, although the law protects minors from the fraud of others and from their own lack of

knowledge, children are still liable for their intentional, malicious, and willful acts. The State argues that to establish a separate standard for juvenile offenders would not only unnecessarily obstruct law enforcement, but would "also make[ ] little sense theoretically." For several reasons, we must agree with the State.

First, we do not believe it within our authority to alter the established standard for determining the voluntariness of a confession. If the "totality of the circumstances" test is to be abandoned in situations involving statements made by minors and a new rule established, it is for the Illinois Supreme Court to make that decision.

Second, even assuming we had the power to set a new standard for determining the voluntariness of a minor's confession, we do not believe that the rule proposed by defendant is either needed or fair. In effect, defendant argues that any statement made by an uncounseled minor, as a matter of law, should be considered coerced and involuntary. As stated above, when determining whether a minor suspect's statement was given voluntarily, Illinois courts scrutinize the statement under the same "totality of the circumstances" standard that they utilize to examine a statement given by an adult. (*Prude*, 66 Ill. 2d at 475-76, 363 N.E.2d at 373; *Knox*, 186 Ill. App. 3d at 812, 542 N.E.2d at 913.) This standard takes into account all relevant circumstances surrounding the giving of the statement including, among other things, the age and experience of the defendant. (*Stachelek*, 145 Ill. App. 3d at 401, 495 N.E.2d at 990.) Additionally, it is understood that special care must be taken to guarantee that a minor's statement is not coerced (*Prude*, 66 Ill. 2d at 476, 363 N.E.2d at 373; *Stachelek*, 145 Ill. App. 3d at 401, 495 N.E.2d at 991), and the presence or absence of the parent is a factor to be considered when determining the coercive nature of the circumstances surrounding the giving of the statement. *Brown*, 182 Ill. App. 3d at 1053, 538 N.E.2d at 913.

This thoughtful standard incorporates all the relevant factors that may contribute to a coerced confession including giving special regard to a minor's youth (*Knox*, 186 Ill. App. 3d at 814, 542 N.E.2d at 914), whereas the "bright line" rule proposed by defendant does not address the question of whether a given statement is voluntary. Under defendant's proposed rule, a 17-year-old suspect with much experience with the police and a very high intelligence would be protected from any incriminating statements he might make prior to speaking with an attorney whether or not those statements were made voluntarily. An 18-year-old suspect who is borderline retarded and who has never been in trouble with the police, however, will have his statement scrutinized under the totality of the circumstances test.

The fact that a minor may not realize the full ramifications of making a statement does not mean that the statement given was coerced and involuntary. We do not believe that, due to the inexperience of youth, minors should be immune from interrogation and protected from their own incriminating statements if those statements were given voluntarily. Such would be an unfair infringement upon the police department's right and duty to investigate crime and obtain evidence.

Finally, defendant contends that the trial judge committed reversible error when he allowed A.H.'s mother to testify to A.H.'s statements regarding the alleged sexual abuse. "Spontaneous declarations" are admissible as exceptions to the hearsay rule based upon the principle that any spontaneous and sincere response to a shocking or startling event or occurrence has a reduced probability of fabrication and, in fact, is "particularly trustworthy" because it is a product of the "sense" and not a product of thoughtful, self-interested reflection. (*People v. Poland* (1961), 22 Ill. 2d 175, 180-81, 174 N.E.2d 804, 807; *People v. White* (1990), 198 Ill. App. 3d 641, 648-49, 555 N.E.2d 1241, 1246.) A party offering an out-of-court statement as a "spontaneous declaration" must demonstrate that (1) the statement relates to the circumstances of the occurrence; (2) the occurrence was sufficiently startling to produce a spontaneous and unreflecting statement; and (3) there was an absence of time to fabricate the statement. (*Poland*, 22 Ill. 2d at 181, 174 N.E.2d at 807; *People v. Roy* (1990), 201 Ill. App. 3d 166, 180, 558 N.E.2d 1208, 1218.) Additionally, in order for such an out-of-court statement to be admissible, there must be at least some other circumstantial evidence besides the "spontaneous declaration" to corroborate the existence of the startling occurrence. *People v. Leonard* (1980), 83 Ill. 2d 411, 419, 415 N.E.2d 358, 362; *Roy*, 201 Ill. App. 3d at 181, 558 N.E.2d at 1218.

■ Defendant concedes that A.H.'s statements satisfy the three factors needed to bring a statement within the "spontaneous declaration" exception to the hearsay rule. Defendant merely argues that A.H.'s statements are inadmissible because, other than her statements and his own coerced confession, there is no other evidence to support A.H.'s assertions of abuse. Curiously, defendant then concludes that, since the victim's mother should not have been allowed to testify to the victim's out-of-court statements, he was impermissibly convicted based solely upon his own confession. This argument is meritless.

First, we have already held that defendant's statement was not coerced. In addition to defendant's own statement, A.H.'s mother tes-

tified that the scratches on A.H.'s abdomen were not there that morning when she dressed her. A.H.'s mother also testified that, when she found her, A.H. was running out of defendant's building crying and screaming and the buttons on her dress were undone. The medical report shows that A.H. was so scared when the doctors tried to examine her that she would not hold still even with two nurses holding her down and the doctor considered placing A.H. under anesthesia in order to examine her. This other evidence provides sufficient corroborating evidence of the sexual abuse.

■ Consequently, it is also clear that defendant was not improperly convicted based solely upon his own incriminating statement. It is an established principle of law that a defendant cannot be convicted of a crime based solely upon his own confession. (*People v. Lambert* (1984), 104 Ill. 2d 375, 378-79, 472 N.E.2d 427, 428.) In this case, however, defendant's statement was corroborated by A.H.'s spontaneous declarations along with the other circumstantial evidence presented above.

■ Defendant also contends that A.H.'s statements are not admissible under section 115—10 of the Code of Criminal Procedure of 1963, entitled "Sexual acts on child under 13—Hearsay exception" (Ill. Rev. Stat. 1991, ch. 38, par. 115—10 (now 725 ILCS 5/115—10 (West 1992))), because the State never demonstrated that A.H. was unavailable to testify at trial before presenting her testimony through her mother. Defendant's argument that A.H.'s statements were inadmissible under section 115—10 is correct but irrelevant. Pursuant to the statutory hearsay exception in section 115—10, a child sexual abuse victim must be shown to be "unavailable as a witness" before his out-of-court statement is admissible. (*People v. Rocha* (1989), 191 Ill. App. 3d 529, 536, 547 N.E.2d 1335, 1339.) Unlike under this statutory hearsay exception, however, the "spontaneous declaration" exception does not require a showing that the out-of-court declarant be unavailable. A.H.'s statements, therefore, were admissible as "spontaneous declarations."

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

MANNING, P.J., and CAMPBELL, J., concur.