*In re* LASHUN H., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Lashun H., a Minor, Respondent-Appellant).

First District (5th Division)    No. 1—95—0183

Opinion filed October 11, 1996.

546

COUSINS, J., dissenting.

Rita A. Fry, Public Defender, of Chicago (Joseph M. Gump, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Janet Powers Doyle, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McNULTY delivered the opinion of the court:

Respondent Lashun H. was adjudicated delinquent for first-degree murder and committed to the Department of Corrections. Respondent claims on appeal that the trial court erred in: (1) finding that respondent's confession was voluntarily given; (2) holding that respondent had knowingly and intelligently waived his privilege against self-incrimination; (3) curtailing his cross-examination of witnesses during the suppression hearing; (4) adjudicating first-degree

murder when respondent had a valid claim for self-defense; and (5) adjudicating first-degree murder when respondent held an unreasonable belief that the use of force in self-defense was justified. We reverse and remand.

On March 12, 1994, the decedent, Antoine Brown, was playing with a group of about 20 boys at 5119 West Adams in Chicago. Respondent, Ralph Anderson and two other boys approached decedent and the other boys. A confrontation ensued in which the decedent was killed by a gunshot wound in the back. Respondent and Anderson were arrested, charged and tried for the shooting. Respondent was 14 years old at the time of the incident.

Before the adjudicatory hearing, respondent sought to suppress a statement given by him to police the day after the shooting. In the suppression hearing, Officer Luis Bergos testified that he went to respondent's home on the day of the shooting and asked respondent's mother, Brenda, about respondent's whereabouts. Officer Bergos left a number where he could be reached. Brenda later testified that Officer Bergos told her that the police would shoot respondent if they found him with his hands in his pockets, but Officer Bergos denied making that statement.

Officer Mike Walter testified that Brenda called him and told him that her son was at the house of Calvin Hudson, his uncle. Officer Walter drove to Brenda's home and she accompanied him to Hudson's home. According to Officer Walter, respondent was awake and in the dining room when they arrived. Officer Walter informed respondent of his *Miranda* rights, asked respondent whether he understood each of his rights and asked respondent if he wished to talk to the police. Respondent indicated that he understood his rights and would cooperate with the police. Officer Walter found respondent to be coherent. Officer Walter asked respondent where the gun used in the shooting was and respondent said that he gave it to his friend Terrell Wyatt so that Wyatt could hide it. Officer Walter then took respondent and his mother to Terrell Wyatt's house. Terrell was not home, but his mother knew where he might be. Terrell's mother led them to a house a block away, where they recovered the gun. Officer Walter and other officers then took respondent and his mother to the 15th District police station. Officer Walter was then asked by Detective Dolan to bring all witnesses to the incident to Area Five police headquarters.

When they arrived at Area Five, the officers took respondent upstairs and asked Brenda to wait downstairs. Officer Walter testified that respondent's mother did not ask to go upstairs and respondent did not ask to have his mother come upstairs.

Respondent's uncle, Calvin Hudson, testified that respondent fell asleep at his house on the night of the shooting. Hudson testified that police came to his house with their guns drawn and went to the bedroom to wake respondent. The officers then picked respondent up, searched him, took him into the dining room and handcuffed him. The officers asked respondent about a shooting and a gun and then put him in a squad car. Hudson went with respondent in a police car to the 15th District police station, while Brenda went to the station in a different police car. Hudson testified that one of the officers in the car said something like, "You should not have shot this boy," and respondent stated that he did not shoot the boy. Hudson also heard an officer say they recovered a gun. At the 15th District police station, Brenda asked the officers when she could see respondent. An officer told Brenda she could see her son in 5 or 10 minutes, but for the entire time they remained at the 15th District station, she was not allowed to see her son.

Police officers then drove respondent, Hudson and Brenda in the back seat of a squad car to the Area Five police station. When they arrived at the Area Five police station, respondent was taken upstairs and Hudson and Brenda were told to wait in a waiting room. Hudson remained at the station until 4 a.m., during which time Brenda asked two or three times whether she could see respondent, but was refused.

Respondent's mother, Brenda Henry, testified that on the day of the shooting, Officer Bergos came to her house looking for respondent and informed her that if the officers "caught [respondent] with his hands in his pocket[s] they were going to shoot him." When Brenda learned that respondent was at Calvin Hudson's house, she informed the police and the police came to her house and took her to Hudson's house. Four officers entered Hudson's house with their guns drawn, went to the bedroom, woke respondent up, took him to the dining room, handcuffed him and asked him where the gun was. The police denied that they awakened respondent. Shortly before midnight, the police drove her in one car and respondent in another to Terrell Wyatt's house, where they recovered a gun. The police then took them to the Chicago Avenue police station and put Brenda in a waiting room. Although Brenda asked to see respondent, she did not see him until 3 a.m., when the officers drove her and Calvin Hudson in a police car with respondent to the Area Five police station. Upon arrival at the station, respondent and Brenda were separated. Brenda asked five times whether she could see respondent, but was refused. At one point, she went upstairs in an attempt to see respondent, but was sent back downstairs. When she finally saw respondent sometime after 6 a.m., he had his head down and tears in his eyes. Respondent told her that he was not the shooter.

Youth Officer Pulius testified that he was assigned to assist respondent in his questioning by Detective Dolan. Officer Pulius met with respondent at the Area Five station and gave him his *Miranda* warnings and explained to respondent that he was there to protect his rights. Officer Pulius asked respondent whether he understood his rights, and respondent stated that he did. Officer Pulius then warned respondent that he could be tried as an adult and asked if he understood the gravity of the situation, and respondent indicated that he did. Respondent then agreed to speak to Officer Pulius and Detective Dolan. Officer Pulius testified that respondent declined food on two occasions and respondent received a drink and went to the washroom. Respondent was a little nervous but was coherent and answered the detective's questions intelligently. Respondent never asked to speak to his parents or an attorney. Officer Pulius testified that he asked one of the detectives whether respondent's parents had been contacted and was told that respondent's parents had been notified, but were not at the station. Officer Pulius never informed respondent that his mother could be with him during the interview nor did he ask respondent whether he wanted his parents there. Officer Pulius admitted that the police guidelines state that a parent, relative or friend should be present whenever a minor is interviewed.

Detective John Dolan testified that he interviewed respondent at Area Five headquarters. Detective Dolan had two conversations with respondent. Officer Pulius was present during both conversations. Although Detective Dolan knew that respondent's mother was at the station and had requested to be present during the questioning of her son, Detective Dolan would not permit her to be present during his questioning of respondent. Detective Dolan never informed respondent that his mother could be present during the questioning. The first round of questioning began at 3:30 a.m. and lasted for about 15 minutes. Respondent claimed that Ralph Anderson was the shooter and that Anderson handed the gun to him. Detective Dolan then interviewed other witnesses for two hours. When Dolan returned to respondent at 5:45 a.m., respondent appeared to be sleeping. However, according to Detective Dolan, respondent appeared coherent, alert and responsive. Detective Dolan told respondent that witnesses had implicated him as the shooter. However, Detective Dolan did not tell him that other witnesses had implicated Anderson as the shooter. Detective Dolan told respondent that one of the witnesses had said respondent had a knife and respondent admitted that he had a knife in his possession. Shortly before 6:15 a.m., respondent made an incriminating statement. Respondent stated that he and several friends were surrounded by a larger group, one of whom hit

one of his friends. Another individual took a swing at respondent and missed, at which time respondent fired a gun, which he had up the right sleeve of his jacket. Respondent's statement was never reduced to writing or signed, nor was it taken in the presence of an assistant State's Attorney.

School psychologist Irvine Hassman testified that respondent's reading and spelling levels were those of a seven-year-old and his math comprehension was that of a 12-year-old. Respondent met with a learning disability specialist for 40 minutes each school day. Hassman testified that he could not determine whether respondent could understand *Miranda* warnings. Hassman read from a report of respondent's language therapist, who wrote that respondent's receptive and expressive language as relating to understanding words was somewhat limited, but his ability to communicate on an everyday basis with teachers and students was within normal limits for his age. Respondent received Ds and Fs in school, but Hassman stated that could have resulted from respondent choosing not to complete his work. Respondent had not taken an I.Q. test, which would have given a clearer picture of respondent's cognitive skills.

The trial court denied respondent's motion to suppress his statement, holding that under the totality of the circumstances, respondent's will was not overborne. The court also determined that Hassman's testimony did not support a finding that respondent did not understand his *Miranda* rights.

At the adjudicatory hearing, the State introduced respondent's statement into evidence. The State also presented witnesses to testify that they saw respondent shoot the victim and heard respondent claim that he had shot someone. Respondent attempted to impeach the State's witnesses and presented evidence to implicate Anderson as the shooter. The court acquitted Anderson and entered a finding of delinquency on respondent and sentenced him to the Department of Corrections.

■ Respondent first claims on appeal that the trial court erred in finding his confession voluntary and denying his motion to suppress his confession. The receiving of an incriminating statement made by a juvenile in the absence of counsel is a sensitive concern requiring great care to assure that the juvenile's confession was neither coerced or suggested, nor a product of fright or despair. *People v. Prude*, 66 Ill. 2d 470, 363 N.E.2d 371 (1977). The test is whether, under the totality of the circumstances, the statement was made freely, without compulsion or inducement, with consideration given to the characteristics of the accused as well as the details of the interrogation. *People v. Prim*, 53 Ill. 2d 62, 289 N.E.2d 601 (1972). Relevant factors in

determining whether a confession was voluntary under the totality of the circumstances include the age, intelligence, experience and physical condition of the accused, the length and intensity of the interrogation, and the existence of any threats, promises, or physical coercion. *People v. Martin*, 102 Ill. 2d 412, 466 N.E.2d 228 (1984). When a juvenile is involved, additional factors come into play, such as the time of day and the presence of a parent or other adult interested in the juvenile's welfare. *People v. Brown*, 235 Ill. App. 3d 479, 601 N.E.2d 1190 (1992). A reviewing court will not disturb a finding by the trial court on the voluntariness of a confession unless the finding is contrary to the manifest weight of the evidence. *People v. Davis*, 97 Ill. 2d 1, 452 N.E.2d 525 (1983).

■ We have carefully reviewed all of the circumstances surrounding respondent's confession and conclude that the trial court's determination that respondent's confession was voluntary is against the manifest weight of the evidence. The coercive nature of the 14-year-old respondent's encounter with the police began immediately upon respondent's arrest at his uncle's house. The police arrived at respondent's uncle's home shortly before midnight and entered the house with guns drawn. Respondent and his mother were taken to the 15th District police station in separate police cars. Upon arrival at the station, respondent's mother and uncle were taken to a waiting room and respondent was taken upstairs. Respondent was not permitted to speak with either his mother or uncle. When respondent was later transported to Area Five police headquarters, his mother and uncle were driven in the same police car, but respondent did not have an opportunity to confer with them since no interrogation occurred at that time, police officers were in the front seat of the car and Terrell Wyatt, who had interests antagonistic to respondent, was seated in the back. Respondent's mother and uncle testified that respondent's mother made repeated requests while at both stations to see respondent, but her requests were denied. The detectives were fully aware of Brenda's presence at the Area Five police station, since she was taken to the station by police officers and she made her presence known to officers in the station. However, Detective Dolan testified that he would not permit respondent's mother to be present during his interrogation of respondent.

Detective Dolan questioned respondent for 15 minutes at 3:30 a.m. and respondent denied that he was the shooter. Respondent was then left alone in the interview room until 5:50 a.m. while the police conducted further investigation. At 5:50 Detective Dolan woke respondent up and questioned him for another 25 minutes. While the detective informed respondent that witnesses had identified him as

the shooter, he never informed respondent that other witnesses had identified Anderson as the shooter. While Detective Dolan claimed that respondent confessed at about 6:15 a.m., respondent was never requested to sign a formal waiver of his rights, this confession was never reduced to writing and was never given to respondent to review and sign. Respondent's mother was not allowed to see him until after he confessed. When respondent saw his mother, he informed her that he was not the shooter. All of these factors, combined with respondent's learning disability and minimal prior contact with the juvenile justice system, lead us to conclude that respondent's confession was not voluntary.

Although a juvenile does not have a *per se* right to consult with a parent before questioning or to have the parent present during questioning, the presence or absence of the parent is a factor in evaluating the voluntariness of a confession under the totality of the circumstances. *People v. Brown*, 182 Ill. App. 3d 1046, 1053, 538 N.E.2d 909 (1989). In *People v. Montanez*, 273 Ill. App. 3d 844, 652 N.E.2d 1271 (1995), the 15-year-old defendant was arrested at 9 p.m. and taken to Area Five police headquarters. Before either a youth officer or the defendant's mother arrived at the station, a detective began questioning the defendant. The detective read the defendant her *Miranda* warnings, and the defendant stated that she understood her rights and would make a statement. Youth Officer Pulius arrived at 12:30 a.m. after defendant gave her statement. Pulius was, however, present for defendant's next three conversations with the detective, which concluded sometime after 6:15 a.m. An assistant State's Attorney spoke with defendant at 1:15 a.m., advised her of her rights and told her that she would be treated as an adult. After speaking with the assistant State's Attorney, defendant agreed to make a statement in the presence of a court reporter. The assistant State's Attorney read the statement to the defendant and the defendant made corrections to the statement and then signed it.

The defendant's mother testified that at 10 p.m., she learned that her daughter was in custody, but the detectives told her that she could not see her daughter at that time but they would notify her when she could. At 2 a.m., when the defendant's mother still had not heard from the police, she went to the station. She was told to wait in a waiting room, but instead went upstairs to find the defendant. She was told to leave, but went back upstairs every hour or so in an attempt to see her daughter. She was finally allowed to see her daughter at 8:30 a.m., after her daughter had made an incriminating statement.

The court reversed the trial court's denial of defendant's motion

to suppress, finding that the defendant's confession was not voluntary since she was "interrogated throughout the night as part of a pattern of police conduct designed to elicit a confession, as well as to obstruct parental counselling." *Montanez*, 273 Ill. App. 3d at 855. The court found that the mother, who had been present at the station for over six hours, had demonstrated an interest in her daughter's welfare. However, the police repeatedly attempted to question the minor without prior parental counseling, thereby obstructing the mother's attempts to communicate with her daughter until after her daughter's confession had been reduced to writing and signed. Such police conduct is material in determining voluntariness of a minor defendant's confession. *Montanez*, 273 Ill. App. 3d at 852.

Courts have repeatedly held that police conduct which frustrates a parent's attempts to confer with her child prior to or during questioning is significant in determining voluntariness of a confession. In *People v. Knox*, 186 Ill. App. 3d 808, 542 N.E.2d 910 (1989), for example, when the defendant was arrested at his home at 9:40 p.m., his father could not accompany him to the station because he was caring for his young children and defendant's mother was not home. Defendant's mother arrived at the station at 10:10 p.m. as soon as she learned of his arrest. She identified herself at the front desk and was told to wait. At 12 midnight, she was told that defendant had already confessed and she should go home. At 2:45, an assistant State's Attorney reduced defendant's statement to writing and defendant corrected and signed the statement.

In reversing the denial of defendant's motion to suppress, the court found that the police had "contributed significantly to eliminating any opportunity defendant had from speaking to his mother at the police station." *Knox*, 186 Ill. App. 3d at 813-14. In evaluating the evidence, the court stated:

> "We do not believe such conduct by police is consistent with the great care required where a juvenile's incriminating statement is received. At worst, the police purposefully precluded defendant's mother from contact with defendant by neglecting to see if defendant's mother had arrived until after such time as defendant had completed his confession. At best, the police simply subjected defendant to the same routine questioning of a criminal suspect without special regard for his youth. Either scenario is impermissible and casts some doubt over the voluntariness of defendant's statement." *Knox*, 186 Ill. App. 3d at 814.

Similarly, in *In re J.O.*, 231 Ill. App. 3d 853, 596 N.E.2d 1285 (1992), although the 12-year-old respondent's parents were at the station, they were not allowed to confer with their son until after he

had confessed. In finding that respondent's statement had been properly suppressed, the court stated:

"A juvenile's age and the fact that the interrogation occurred in the middle of the night may properly be considered in evaluating the voluntary nature of a confession. [Citation.] Additionally, if parents have indicated an interest by their presence, then they should be allowed to confer with their children before any questioning begins, as well as be present when any questioning occurs." *In re J.O.*, 231 Ill. App. 3d at 855.

The court concluded that the presence or absence of a parent is one factor in evaluating the voluntary nature of a confession under the totality of the circumstances.

In *People v. Brown*, 182 Ill. App. 3d 1046, 538 N.E.2d 909 (1989), the court held that the fact that those questioning a defendant were unaware of the defendant's mother's presence at the police station was insufficient to avoid the obligation to allow a parent to see her child where the parent indicated an interest by her presence at the police station. The court explained:

"[T]he officers who know of the parent's presence have an affirmative duty to inform those actually questioning a juvenile of the parent's presence and request to see her child. And, in order to ensure the true voluntariness of a statement, those questioning the juvenile have an affirmative duty to stop the questioning and allow the parent to confer with her child." *Brown*, 182 Ill. App. 3d at 1053-54.

The police in the instant case clearly frustrated respondent's mother's attempts to confer with her son. Respondent and his mother were taken to the 15th District police station in separate police cars. Despite her requests, respondent's mother was not allowed to speak with her son at the station. Although respondent's mother was transported to Area Five in the same car as her son, as discussed previously, she had no opportunity to confer with her son at that time. Once at Area Five, respondent and his mother were again separated. Although Youth Officer Pulius at Area Five claimed he was unaware that respondent's mother was at the Area Five station, other officers, including Officer Walter from the 15th District, who transported respondent's mother to the station, and Detective Dolan, who interrogated respondent, were fully aware of the mother's presence at the station. When Youth Officer Pulius asked whether respondent's parents had been contacted, a detective told him that respondent's parents had been notified but were not at the station. This misrepresentation further indicates that the detectives did not want Officer Pulius to permit respondent's mother to confer with her son or to be present during the interrogation but instead attempted

to create a coercive environment and extract a confession from respondent, although the mother had fully cooperated with the police during their investigation.

While Officer Walter could not recall whether respondent or his mother requested to see one another while at the 15th District station, respondent's mother and uncle testified that respondent's mother requested to see her son several times but was refused. Furthermore, while Detective Dolan was aware that respondent's mother requested to be present during her son's questioning, he testified that he would not permit her to be present during the interview. At one point, respondent's mother went upstairs in an attempt to see respondent, but she was sent back downstairs. Respondent's mother was not permitted to see her son until after 6 a.m., after he had confessed. Common sense leads us to conclude that respondent's mother would not have remained at the station from midnight until after 6 a.m., without asking to see her son and being interested in seeing her son. Her attempts, however, were clearly frustrated by the police so that they could create an intimidating atmosphere and obtain a confession.

Just as the absence of a parent does not *per se* make a confession involuntary, we do not find the presence of a youth officer *per se* makes a confession voluntary. See *People v. Gardner*, 282 Ill. App. 3d 209, 218 (1996) (in some cases where the defendant is prevented from seeing his parent or guardian, the presence of the youth officer would not be enough to demonstrate voluntariness). We instead consider this a significant factor in determining that respondent's confession was not voluntary, along with the coercive nature of respondent's encounter with police, respondent's youth, his learning disabilities, his lack of experience with the criminal or juvenile justice system, and the failure of the detectives to contact an assistant State's Attorney or reduce respondent's statement to writing.

The officers' intimidation of respondent began when they entered his uncle's house at 11 p.m. with guns drawn. While it is undisputed that the officers entered the house with their guns drawn, the dissent claims that there is no evidence that respondent ever saw a police gun out of its holster since respondent's mother and uncle testified that respondent was asleep when the police entered the house. However, Officer Walter testified that respondent was awake and in the dining room when the officers entered the house. We must accept the officer's testimony as true, so as not to substitute our judgment for that of the trial court on this issue of credibility. *People v. Young*, 206 Ill. App. 3d 789, 564 N.E.2d 1254 (1990).

The intimidation continued as the police took respondent to one

police station and then another, and detectives questioned him at 3:30 a.m. and again at 5:45 a.m., telling respondent only of the inculpatory and not exculpatory evidence the detectives had received from witnesses. If respondent slept at all between his arrest at around 11 p.m. and his confession at about 6 a.m. the following morning, it was briefly between the conclusion of the first interview at 3:45 and the beginning of the second interview at 5:50 a.m. See *People v. McGhee*, 154 Ill. App. 3d 232, 507 N.E.2d 33 (1987) (15-year-old defendant's statement found involuntary where the defendant was subjected to a lengthy interrogation, was lacking in sleep, the police failed to properly notify defendant's parents or a youth officer and failed to permit defendant's mother to see him at the police station prior to the time he made an inculpatory statement). The detective's testimony that respondent appeared coherent during the questioning is not in itself determinative of the voluntariness of the statement.

Respondent was even more vulnerable than an average 14-year-old since he had learning disabilities, a limited ability to express and understand words and the reading skills of a seven-year-old. Respondent's prior contacts with the police were minimal and were not of the nature that would have lessened the intimidation inherent in this encounter with the police. This was respondent's first referral to juvenile court. While respondent had been charged with possession of controlled substance, that charge was screened out by the assistant State's Attorney after respondent successfully completed a drug education program. Respondent also had a station adjustment, but that is merely a verbal warning from the police that occurs when the police take a minor to the police station but release him after deciding not to refer the matter to juvenile court. *People v. D.B.*, 202 Ill. App. 3d 194, 559 N.E.2d 873 (1990). Thus, neither of these prior experiences would have given respondent the sophistication or an understanding of how to conduct himself while being interrogated by police in a murder case.

The voluntariness of respondent's confession in this case is even more suspect in light of the detectives' failure to call the felony review section of the State's Attorney's office and have an assistant State's Attorney present during any of the interviews with respondent. Furthermore, respondent's statement was never reduced to writing and was therefore never given to respondent to check for accuracy and for signature. When respondent was finally permitted to see his mother after giving his confession, he told her that he was not the shooter. The fact that the detectives failed to call an assistant State's Attorney or reduce respondent's statement to writing leads to the inference that the police knew respondent's confession was tenu-

ous and were concerned that they could not get respondent to consistently repeat his confession.

Taking into consideration the totality of the circumstances surrounding respondent's confession, we find respondent's confession involuntary. The 14-year-old learning-disabled respondent, who had minimal previous contact with police, was brought to the station late at night, after being removed from his uncle's house at gunpoint. He was interrogated throughout the early morning hours, separated from his family during the interrogation period, and gave a confession that was never reduced to writing. Notwithstanding the presence of a youth officer during the final interrogation that resulted in the admission, these other circumstances convince us that the trial court's decision to deny respondent's motion to suppress was against the manifest weight of the evidence.

In light of our decision to reverse the trial court's order denying respondent's motion to dismiss and to remand this case for a new trial, we need only briefly address one other contention raised by respondent in this appeal. We note that if on remand the only evidence respondent presents to support his claim of self-defense is that his group was surrounded and someone took a swing at him, that evidence alone is insufficient to sustain respondent's claim that he feared imminent death or great bodily harm.

Accordingly, for the reasons set forth above, the trial court order denying respondent's motion to suppress is reversed and this cause is remanded for a new trial.

Reversed and remanded.

HOURIHANE, J., concurs.

JUSTICE COUSINS dissenting:

I dissent.

The trial judge's ruling should not be disturbed on review unless it is contrary to the manifest weight of the evidence. *People v. Brown*, 169 Ill. 2d 132, 144, 661 N.E.2d 287 (1996). The facts in the instant case, *inter alia*, establish that the mother and uncle were in the presence of the minor before the minor was questioned, the youth officer was present with the minor during questioning, and the minor never requested to see his mother after being taken to the police station even though he was aware of her arrival there with him. Moreover, respondent was given his *Miranda* warnings on several occasions prior to questioning, and the police fully complied with the Juvenile Court Act of 1987 (705 ILCS 405/3—8 (West 1994)). In addition, re-

spondent had two previous experiences with the criminal justice system: a charge for possession and a station house adjustment for battery just a few weeks before the incident. See *People v. Foster*, 168 Ill. 2d 465, 479, 660 N.E.2d 951 (1995) (familiarity with criminal system lessens coercive possibilities); *People v. Denton*, 256 Ill. App. 3d 403, 406, 628 N.E.2d 900 (1993). Thus, under the totality of circumstances, there is substantial evidence to support the decision of the trial court.

The precedents on this issue strongly support the trial court's decision, as we have upheld a trial court's determination on voluntariness under weaker total circumstances than the instant matter. In the following cases, parents were not even informed when their minor was taken into custody, in violation of the Juvenile Court Act: *People v. Muhummad*, 257 Ill. App. 3d 359, 629 N.E.2d 106 (1993) (defendant questioned for six hours at night); *People v. Lash*, 252 Ill. App. 3d 239, 624 N.E.2d 1129 (1993); *People v. Williams*, 275 Ill. App. 3d 249, 256, 655 N.E.2d 1071 (1995); *Denton*, 256 Ill. App. 3d 403. In *Williams*, no youth officers arrived until 4:15 a.m., and the minor had already gone through seven hours of custody and two interrogations. In *Denton*, no youth officers were present when questioning began. *Denton*, 256 Ill. App. 3d at 404. Although police refused to let Brenda see her son during questioning, the Juvenile Court Act does not require this latitude, and this court and others have upheld several confessions where police have directly refused to allow a parent to see his or her child. See *In re D.C.*, 244 Ill. App. 3d 55, 613 N.E.2d 1139 (1992); *People v. Bobe*, 227 Ill. App. 3d 681, 592 N.E.2d 301 (1992); *People v. Pace*, 225 Ill. App. 3d 415, 587 N.E.2d 1257 (1992). In contrast, *no case has ever found a confessions coerced when a youth officer has been present for questioning after a valid arrest and proper Miranda warnings*, and there are additional factors cited above that also favor the voluntariness of the confession. The majority is correct that the presence of a youth officer does not make a minor's confession voluntary *per se*, but the majority has not and cannot cite supporting authority under the circumstances in this matter.

The majority makes four crucial errors in analyzing the circumstances present in this case. First, the majority repeatedly emphasizes the coercive nature of the police arrival at Mr. Hudson's house. Brenda and Mr. Hudson testified that the police had their guns drawn as they entered, but both also testified that respondent was asleep and that the police woke him up. The majority opinion correctly describes the testimony, yet concludes its analysis by asserting that respondent was taken at gunpoint. However, there was no testimony that police ever aimed a weapon at respondent; and any actions by

police while respondent was asleep are immaterial to the voluntariness of his confession.

Second, the majority claims that respondent did not have an opportunity to confer with either his mother or uncle even though he sat next to them on his car ride between police stations. The majority's first rationale is that they could not confer because no interrogation was occurring at the same time. This court rejected that argument in *People v. Brown*, 235 Ill. App. 3d 479, 491, 601 N.E.2d 1190 (1992), where, as in this matter, the minor's mother knew that police would be questioning her son. See also *In re S.D.S.*, 103 Ill. App. 3d 1008, 1013, 431 N.E.2d 759 (1982) (confession voluntary when minor sat next to father in police station before questioning). The majority's other rationale is that any conversation would not have been private from the police or Terrell Wyatt. Nevertheless, the majority provides no authority for its claim that absolute privacy is required, and the court in *S.D.S.* did not consider privacy in its conclusion that the minor could confer at the police station while his father sat next to him. See *S.D.S.*, 103 Ill. App. 3d at 1013.

Third, the majority contends that respondent's previous police interrogations for crimes of possession and battery would not give him an "understanding of how to conduct himself" during interrogation in a murder case, and, thus, his previous police experiences did not lessen the coercive nature of the questioning at issue. However, the majority provides no authority to support its assertion, and no basis exists for the claim that previous police experience must be crime-specific in order to render familiarity with the criminal system and lessen coerciveness. See *Denton*, 256 Ill. App. 3d at 406 (minor's previous dealings with police supported voluntariness of murder confession).

Fourth, the majority contends that respondent's learning disabilities left him particularly vulnerable. Although respondent's reading and writing skills are weak, his math and communication skills are within normal limits for his age. Respondent's intelligence and communication skills are the relevant issues for a knowing and voluntary *Miranda* waiver, and there is almost no evidence that respondent lacked these skills as compared with other 14-year-olds. Respondent could fully comprehend the oral *Miranda* warnings, and his reading skills are irrelevant to a determination of voluntariness.

The only two relevant factors that the majority has properly included are the night interrogation and Brenda's absence from questioning. Analyzing the former, interrogations at night do not necessarily make an atmosphere coercive. See *People v. Anderson*, 276 Ill. App. 3d 1, 7, 657 N.E.2d 57 (1995) (minor at station entire

night); *People v. M.S.*, 247 Ill. App. 3d 1074, 618 N.E.2d 623 (1993) (fact that minor slept while at police station indicates that environment may not have been frightening and coercive). The interviewing detectives stated that respondent was coherent and alert while questioning took place, and the degree that night interrogation could have affected an individual is best weighed by the trier of fact. *People v. Bounds*, 171 Ill. 2d 1, 33, 662 N.E.2d 1168 (1995) (eight hours not unreasonably long). The court could have properly found that the brief night questioning in this case was not unduly traumatic.

Lastly, the majority cites the officers' refusal to allow Brenda's request to see respondent. Although it is preferable to have parents present during questioning (*People v. Johnson*, 236 Ill. App. 3d 125, 132 (1992)), their presence is *only one factor* to consider under the totality of circumstances test. *Williams*, 275 Ill. App. 3d at 256; *People v. Hernandez*, 267 Ill. App. 3d 429, 433 (1994). As opposed to this single factor, the police allowed respondent a chance to confer with his mother and uncle before questioning, fully complied with the Juvenile Court Act, repeatedly gave *Miranda* warnings that respondent—who had experience with the justice system—acknowledged he understood, never lied to respondent, always had a youth officer present for questioning, allowed respondent food and drinks, and conducted two interviews which together lasted less than 45 minutes.

The majority relies heavily on *People v. Montanez*, 273 Ill. App. 3d 844, 652 N.E.2d 1271 (1995). However, in *Montanez*, a youth officer was not present when questioning began. We stated in *Montanez*: "*[W]here the State failed to take appropriate steps to ensure that a juvenile defendant had an opportunity to confer with an interested adult, either a parent or a youth officer, this court has held that the police conduct rendered his confession inadmissible.*" (Emphasis in original.) *Montanez*, 273 Ill. App. 3d at 854. The parental restrictions in this case are no more severe than in *D.C.*, *Bobe*, or *Pace*, all of which allowed the minor's statements because a youth officer was present. The trial court could reasonably conclude that Brenda's absence did not foster a coercive atmosphere under the totality of circumstances in this matter, and, thus, the court's determination is not against the manifest weight of the evidence.

Accordingly, I dissent.